No. 70,425

STEPHEN SCOTT CORDER, M.D., *Appellant/Cross-Appellee,* v. THE KANSAS BOARD OF HEALING ARTS and RICHARD G. GANNON, in his individual capacity, *Appellees/Cross-Appellants.*
(889 P.2d 1127)

Opinion filed October 28, 1994.

*Alan V. Johnson*, of Sloan, Listrom, Eisenbarth, Sloan & Glassman, of Topeka, argued the cause, and *Jay Hinkel*, of Irwin, Clutter & Severson, of Topeka, was with him on the briefs for appellant/cross-appellee.

*John W. Campbell*, deputy attorney general, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the brief for appellees/cross-appellants.

The opinion of the court was delivered by

DAVIS, J.: This appeal arises out of the temporary suspension by the Kansas Board of Healing Arts (Board) of Dr. Stephan Scott Corder's license to practice his profession. The district court affirmed the Board's suspension of his license and denied Dr. Cor-

der's claim for damages against both the Board and its executive director; the court also granted Dr. Corder a limited award of attorney fees against the Board. Dr. Corder appeals, and the Board cross-appeals the award of attorney fees.

### Nature of the Case

The Board entered an emergency order temporarily suspending the license of Dr. Corder on March 13, 1989, and directed him to submit to a mental examination. The emergency order was based upon psychiatric evidence concerning his ability to care for his patients. The central inquiry dealt with Dr. Corder's publicly expressed beliefs concerning UFO's and extraterrestrial beings. Dr. Corder initially agreed but then refused to submit to a mental examination; he also requested a hearing on the merits of the emergency order. Although proceedings were held before the Board, no hearing was held by the Board on the emergency suspension.

An action was filed by Dr. Corder on March 28, 1990, seeking relief in the nature of mandamus compelling the Board to afford him a hearing on the emergency suspension. On November 30, 1990, the district court issued an order requiring the Board to afford Dr. Corder a hearing. This hearing was conducted on April 8-12, 1991, before presiding officer Michael A. Barbara, appointed as hearing officer by the Board. The Board entered its final order on August 29, 1991, continuing the suspension of Dr. Corder's medical license and again directing him to submit to a mental examination.

Dr. Corder filed a petition for judicial review of the final administrative order under the Kansas Judicial Review Act, K.S.A. 77-601 *et seq.* In this petition, Dr. Corder sought damages against the Board and its executive director based on the Kansas mandamus statute, K.S.A. 60-802(c); the Kansas Tort Claims Act, K.S.A. 75-6101 *et seq.*; and the federal civil rights statute, 42 U.S.C. § 1983 (1988). The district court affirmed the Board's order in a 53-page opinion, relying on different grounds than those contained in the Board's order.

The district court thereafter conducted a bench trial on Dr. Corder's claims for damages. In a 79-page opinion, the court de-

termined that Dr. Corder had sustained damages in the amount of $185,220.86, consisting of lost income, emotional distress, and consequential damages. The court concluded, however, that the Board and its executive director were both immune from liability or damages under both state and federal law, except for attorney fees attributable to the securing of the order compelling a due process hearing. Attorney fees were awarded against the Board in the amount of $34,787 pursuant to 42 U.S.C. § 1988 (1988).

## Facts

Dr. Corder is a medical doctor licensed to practice medicine in Kansas. The Board regulates and licenses medical doctors in Kansas. K.S.A. 65-2801 *et seq.* Richard Gannon was the executive director of the Board from July 11, 1988, through August 6, 1991. The duties of the executive director of the Board, as more fully set forth in this opinion, are contained in K.S.A. 65-2878.

In October 1988, a Kansas Board of Pharmacy drug inspector delivered to the Board a complaint pertaining to Dr. Corder's prescribing of the drug Dilaudid. Steven French, a Board inspector, was assigned to investigate this complaint. French collected information concerning Corder's prescription practices with Dilaudid.

On December 3, 1988, French was scanning a tabloid in a supermarket when he noticed an article on UFO's entitled "They're Coming, Space Alien Invasion Only 3 Years Away, Says Top UFO Expert." The article referenced Dr. Corder's comments concerning UFO's and extraterrestrial life. French brought the article to the attention of both Gannon and Joseph Furjanic, disciplinary counsel for the Board.

Pursuant to Gannon's request, on December 6, 1988, Dr. Corder met with Gannon, Furjanic, and two psychiatrists, Dr. Swogger and Dr. Collins. Dr. Corder was not aware that Dr. Swogger and Dr. Collins were psychiatrists. In that meeting Dr. Corder agreed to stop prescribing Dilaudid and to assist in the investigation of his prescription practices. He also spoke at length about his involvement with and theories concerning UFO's. Although Dr. Swogger expressed concerns about Dr. Corder's "de-

lusional systems," he did not believe that they were infringing upon Dr. Corder's ability to practice medicine at that time.

On February 9, 1989, the Board review committee (Gannon, Furjanic, and French along with Drs. Cossmann and Mallory) recommended that the case against Dr. Corder be closed.

On February 15, 1989, Dr. Corder wrote a letter to the Director of the Defense Intelligence Agency reporting various warnings he had received from extraterrestrials concerning an assassination attempt on President Bush, earthquakes in Kansas City, and intruders in the Pentagon. At the request of Gannon, on February 21, 1989, Dr. Corder agreed to a second mental evaluation conducted by Dr. Fowler Jones. This evaluation had also been prompted at the insistence of Dr. Corder's family. Dr. Jones found no convincing evidence that Dr. Corder was delusional, psychotic, or a danger to his patients.

On February 23, 1989, Furjanic wrote Dr. Corder a letter informing him that the committee recommended his drug prescribing case be closed and that periodic prescription checks be conducted. The following day Dr. Corder sent the Board a newspaper article regarding the recent "sightings" of spaceships in Russell, Kansas, with a note stating, "Look, I need not say more. Donna [Butts] in Russell."

On March 8, 1989, French received a call from an Ottawa police detective and a United States Secret Service Agent, Larry Stewart, regarding Dr. Corder's letter to the Defense Intelligence Agency. French and Stewart interviewed Dr. Corder on March 8, 1989, and Dr. Corder talked extensively about UFO's and Cephas (also known as Peter the Apostle), and predictions he made in his letter to the Defense Intelligence Agency.

The Board arranged for Dr. Corder to be evaluated at the Menninger Clinic on March 9, and Dr. Swogger again interviewed Dr. Corder. Dr. Swogger did not recommend suspending Dr. Corder's license and concluded that Dr. Corder was probably nonviolent at the time. Dr. Swogger also stated that patient care records should be reviewed before he could opine about the effect of Dr. Corder's beliefs on his patient care.

Executive Director Gannon and disciplinary counsel Furjanic wanted further assessment and, when Dr. Swogger was not avail-

able, they arranged for Dr. Hyland to conduct a second evaluation. Before seeing Dr. Corder, Dr. Hyland recommended an inpatient evaluation. The trial court found, however, that Gannon and Furjanic left Dr. Hyland with certain misunderstandings about Dr. Corder and that information affected Dr. Hyland's opinion. Dr. Hyland was under the impression that Dr. Corder himself had threatened the President and that Dr. Corder stated that he personally was in contact with extraterrestrials. Dr. Hyland did not know that Dr. Swogger believed it was necessary to review patient care records or that Dr. Swogger's opinion was less than 24 hours old.

On March 10, 1989, Dr. Hyland interviewed Dr. Corder. Dr. Hyland advised Dr. Corder that he had a thinking disorder and that he would have to undergo an inpatient evaluation or lose his license to practice medicine. Dr. Corder walked out after about 30 minutes. Dr. Corder testified that he feared inpatient treatment more than losing his license.

Based upon his evaluation, Dr. Hyland concluded Dr. Corder was psychotic and that his condition would affect his medical practice. He recommended that Dr. Corder undergo a thorough mental examination before being allowed to continue the practice of his profession in the State of Kansas.

Gannon presented Dr. Hyland's opinion to a majority of the members of the Board through individual telephone calls on March 10-12, 1989, and asked for their input. The Board verbally approved an emergency suspension order and examination. On March 13, 1989, Gannon signed an emergency order suspending Dr. Corder's license and, in addition, ordered him to submit to a complete mental examination by Dr. Hyland or his designee.

Through retained counsel, Dr. Corder appealed the emergency suspension and the order for examination to the Board en banc; he requested an immediate formal hearing under the Kansas Administrative Procedure Act, K.S.A. 77-501 *et seq.* On April 12, 1989, Furjanic talked with Dr. Corder's attorney. The district court found that Furjanic and Dr. Corder's attorney had agreed that Dr. Mittleman would evaluate Dr. Corder on May 8 and 9, 1989. Dr. Corder's attorney did not consent to a continued suspension of Dr. Corder's license.

The Board met on April 15, 1989, and ratified the emergency order. Neither Gannon nor Furjanic told the Board that Dr. Corder had requested a hearing. On May 22, 1989, Dr. Corder's attorney called Furjanic and told him that Dr. Corder would not submit to the evaluation with Dr. Mittleman and that he would be seeking another attorney. Between May and November 1989, Dr. Corder unsuccessfully sought counsel. He filed a pro se action in the federal district court, which action was later dismissed.

On March 28, 1990, Dr. Corder filed his first petition in the instant case, seeking in part an order of mandamus compelling the Board to comply with the Kansas Administrative Procedure Act so that he could exhaust his administrative remedies.

Gannon notified Dr. Corder and his counsel that the Board would meet again on April 21, 1990, and would review the emergency order. The Board reviewed the order but did not set it aside. No evidence was permitted at the hearing, and the Board assumed that until Dr. Corder complied with the order requiring a mental examination, he would remain suspended. In addition, the Board also instituted a separate disciplinary action against Dr. Corder for violating the March 13, 1989, order requiring him to submit to a mental examination.

On April 24, 1991, the court entered its order remanding "the issue of whether Dr. Corder has the inability to practice medicine and surgery" to the Board for hearing in accord with K.S.A. 77-536(e) of the Kansas Administrative Procedure Act and also remanding "the issue of whether Dr. Corder waived his K.S.A. 77-536(e) hearing."

The Board appointed Michael A. Barbara as the presiding officer to determine the above issues. The Board also initiated a separate disciplinary proceeding involving an allegation that Dr. Corder refused to comply with an order of the Board requiring the mental examination.

From April 8-12, Barbara conducted an adjudicative hearing and on May 6, 1991, issued an order which provided in part:

"[T]he Board's order of March 13, 1989, and proceedings prior to and subsequent to that date have all been in full compliance with K.S.A. 65-2801 *et seq.* and the Kansas Administrative Procedure Act of K.S.A. 77, Article 5.

"A complete mental examination will determine whether Respondent still suffers from this disability or, if he does, whether there is still the danger to patients as found by this officer herein.

"The above Findings of Fact and Conclusion of Law justify the order of March 13, 1989, for temporary suspension of Respondent's license and for an order directing Respondent to forthwith submit to a mental examination by physician(s) selected by the Board. Until Respondent submits to a mental examination, his license to practice medicine and surgery under the Act will remain suspended."

The Board adopted the above order on August 29, 1991. The district court affirmed the Board's order on March 3, 1992.

Within five weeks after the court affirmed the Board's order, Dr. Corder presented psychiatric and psychological evaluations for the Board's consideration. The Board thereafter reinstated Dr. Corder's license to practice medicine in the State of Kansas.

Dr. Corder raises the following nine issues in his appeal, with several subheadings under each issue. We reference the subissues only when necessary in the text of the opinion: (I) The emergency order of March 13, 1989, violated Dr. Corder's constitutional rights to due process; (II) the emergency order of March 13, 1989, violated Dr. Corder's constitutional rights of religious expression; (III) the emergency order of March 13, 1989, violated Kansas statutory law; (IV) the district court erred in affirming the Board's final order of August 29, 1991; (V) defendant Gannon is not immune from liability for damages assessed under 42 U.S.C. § 1983; (VI) the Board is not immune from liability for damages assessed under the Kansas mandamus statute; (VII) neither the Board nor Gannon are immune from liability for damages assessed under the Kansas Tort Claims Act; (VIII) Dr. Corder has a viable claim for damages under Kansas law for violation of his constitutional rights; and (IX) the district court erred in limiting the amount of fees it awarded under 42 U.S.C. § 1988. The Board raises the following issue in its cross-appeal: The district court erred in its entry of judgment of 42 U.S.C. § 1988 attorney fees against the Board.

The Emergency Suspension Order—Issues I, III, and VI

Board proceedings against Dr. Corder are governed by the

Kansas Healing Arts Act, 65-2801 *et seq.* and the Kansas Administrative Procedure Act, K.S.A. 77-501 *et seq.* We must consider specific provisions of both acts and their interplay in order to resolve the issues surrounding the Board's issuance of its emergency order, its order for mental examination, and the Board's failure to conduct a full hearing on Dr. Corder's suspension.

K.S.A. 65-2812 establishes the Board for the purpose of administering the provisions of the Kansas Healing Arts Act. For purposes of this decision, we need not set forth all of the powers granted to the Board. Nor is it necessary to discuss all of the provisions of the Kansas Administrative Procedure Act in resolving the issues presented. Our decision will key on specific provisions of both acts and the interplay between both acts in resolving the issues raised by Dr. Corder.

K.S.A. 65-2836 sets forth the grounds upon which a licensee's license may be revoked, suspended, or limited; the licensee may be publicly or privately censured; or the licensee's application for a license or for reinstatement of a license may be denied. The specific ground we deal with in this opinion is set forth in K.S.A. 65-2836(i), which provides:

"The licensee has the inability to practice the branch of the healing arts for which the licensee is licensed with reasonable skill and safety to patients by reason of . . . or as a result of any mental . . . condition. In determining whether or not such inability exists, the board, upon reasonable suspicion of such inability, shall have authority to compel a licensee to submit to mental . . . examination . . . by such persons as the board may designate. To determine whether reasonable suspicion of such inability exists, the investigative information shall be presented to the board as a whole, to a review committee of professional peers of the licensee established pursuant to K.S.A. 65-2840c . . . or to a committee consisting of the officers of the board elected pursuant to K.S.A. 65-2818 . . . and the executive director appointed pursuant to K.S.A. 65-2878 . . ., and the determination shall be made by a majority vote of the entity which reviewed the investigative information. . . . For the purpose of this subsection, *every person licensed to practice the healing arts* and who shall accept the privilege to practice the healing arts in this state by so practicing or by the making and filing of an annual renewal to practice the healing arts in this state *shall be deemed to have consented to submit to a mental . . . examination . . . when directed in writing by the board and further to have waived all objections to the admissibility of the testimony . . . at any*

*proceeding or hearing before the board* on the ground that such testimony or examination . . . constitutes a privileged communication." (Emphasis added.)

The provisions of K.S.A. 65-2836(k) provide an additional ground for possible revocation, suspension, or limitation of license:

"The licensee has violated any lawful rule and regulation promulgated by the board or violated any lawful order or directive of the board previously entered by the board."

K.S.A. 65-2838 empowers the Board "to take disciplinary action authorized by K.S.A. 65-2836."

"The board may temporarily suspend or temporarily limit the license of any licensee in accordance with the emergency adjudicative proceedings under the Kansas administrative procedure act if the board determines that there is cause to believe that the grounds exist under K.S.A. 65-2836 and amendments thereto for disciplinary action authorized by K.S.A. 65-2836 and amendments thereto against the licensee and that the licensee's continuation in practice would constitute an imminent danger to the public health and safety." K.S.A. 65-2838(c).

K.S.A. 77-536 of the Kansas Administrative Procedure Act authorizes the Board as a state agency to use emergency proceedings. K.S.A. 77-536 provides:

"(a) A state agency may use emergency proceedings: (1) In a situation involving an immediate danger to the public health, safety or welfare requiring immediate state agency action or (2) as otherwise provided by law.

"(b) The state agency may take only such action as is necessary: (1) To prevent or avoid the immediate danger to the public health, safety or welfare that justifies use of emergency adjudication or (2) to remedy a situation for which use of emergency adjudication is otherwise provided by law.

"(c) The state agency shall render an order, including a brief statement of findings of fact, conclusions of law and policy reasons for the decision if it is an exercise of the state agency's discretion, to justify the state agency's decision to take the specific action and the determination of: (1) An immediate danger or (2) the existence of a situation for which use of emergency adjudication is otherwise provided by law.

. . . .

"(e) After issuing an order pursuant to this section, *the state agency shall proceed as quickly as feasible to complete any proceedings that would be required if the matter did not justify the use of emergency proceedings under subsection (a)*." (Emphasis added.)

In this case, the Board issued its emergency suspension order based upon the report of Dr. Hyland. The district court, after a

full hearing, concluded that the emergency suspension order was supported by probable cause. The record supports the trial court's conclusion, and we affirm the findings and the conclusions of the trial court that the issuance of the emergency suspension order in this case was consistent with both the applicable provisions of the Kansas Healing Arts Act and the applicable provisions the Kansas Administrative Procedure Act.

At the time the Board issued its emergency suspension order, it also ordered a mental examination under the above provisions of K.S.A. 65-2836(i). Having done so, it then relied upon the following provision of the Kansas Healing Arts Act to deny a hearing until Dr. Corder submitted to the ordered mental examination:

"Whenever the board directs, pursuant to subsection (i) of K.S.A. 65-2836 and amendments thereto, that a licensee submit to a mental . . . examination . . ., *the time from the date of the board's directive until the submission to the board of the report of the examination . . . shall not be included in the computation of the time limit for hearing prescribed by the Kansas administrative procedure act.*" (Emphasis added.) K.S.A. 65-2842.

Dr. Corder initially agreed to submit to the mental examination ordered by the Board but then refused. His refusal continued throughout all proceedings before the Board.

The Board contends that its order for examination was authorized by K.S.A. 65-2836(i) and that K.S.A. 65-2842 specifically excludes the time elapsing from its order until Dr. Corder's compliance from computation of the "time limit for hearing prescribed by the Kansas administrative procedure act." According to its argument, the Board did not violate K.S.A. 77-536(e), which requires it to "proceed as quickly as feasible to complete any proceedings that would be required if the matter did not justify the use of emergency proceedings under subsection (a)."

The difficulty with the Board's position, as noted by the district court, is that Dr. Corder was suspended without hearing and denied a hearing unless he submitted to the mental examination. The effect was to continue the emergency suspension without any hearing for approximately two years. This action, or inaction, by the Board denied Dr. Corder his rights under Kansas law, K.S.A.

77-536(e), which required the Board, after issuing an order pursuant to emergency proceedings to "proceed as quickly as feasible to complete any proceedings that would be required if the matter did not justify the use of emergency proceedings under subsection (a)." This action, or inaction, by the Board also denied Dr. Corder due process of law on the ultimate issue of his suspension from the practice of medicine in the State of Kansas.

While the Board has authority to order an examination under K.S.A. 65-2836(i), and while K.S.A. 65-2842 would seem to expressly authorize the Board not to hold a hearing without due process implications until Dr. Corder submitted to the examination, K.S.A. 77-536(e) governs the Board as a state agency and required the Board to hold a hearing on Dr. Corder's suspension "as quickly as feasible."

Confusion reigned, however, as to the proper application of K.S.A. 65-2842 in all proceedings before the Board. The Board relied upon K.S.A. 65-2842 in its contention that the time delay did not count. K.S.A. 65-2842 says as much. The hearing officer for the Board found that the order for examination was valid and that Dr. Corder's suspension should remain in effect until Dr. Corder submitted to the examination. The hearing officer further concluded that Dr. Corder waived his due process rights by failing to submit to an examination. Finally, the hearing officer concluded that Dr. Corder violated the order of the Board for an examination by refusing to submit to an examination and ordered Dr. Corder's license suspended for that violation under the provisions of K.S.A. 65-2836(k). The Board adopted the hearing officer's findings and conclusions and entered its order suspending Dr. Corder's license.

The district court grappled with this dual order issued by the Board—emergency suspension and order for examination. The court found both orders were lawfully entered by the Board but concluded that the operation of both together violated Dr. Corder's due process rights to an adjudicative hearing on the merits of his emergency suspension.

The trial court, while affirming the Board's order of suspension, searched for a means the Board could have used to avoid the

denial of due process to Dr. Corder. The trial court concluded that, at the very least, the Board should have held a hearing on the emergency suspension within a reasonable time, thereby allowing Dr. Corder the opportunity to test the basis for such an emergency. Additionally, the trial court said that the Board should have proceeded with a separate hearing within a reasonable time on Dr. Corder's refusal to submit to an examination, which would have provided Dr. Corder with a forum to test the basis for the emergency hearing. Such proceedings would have further provided a forum for Dr. Corder to test the basis for the order requiring an examination. While erroneously recognizing the validity of both Board orders, the court properly concluded that the emergency suspension without hearing for the extended period of time denied Dr. Corder due process of law.

The two acts with which we deal must be read together and harmonized if possible to accomplish the purpose of the legislature. K.S.A. 65-2836 sets forth the grounds for revocation, suspension, or limitation of license. K.S.A. 65-2838 grants the Board jurisdiction for disciplinary action against the licensee and empowers the Board to proceed on an emergency suspension basis. K.S.A. 65-2838 references K.S.A. 65-2836 as the grounds upon which emergency suspension may be accomplished. K.S.A. 65-2838 does not incorporate the provisions of K.S.A. 65-2836 but merely refers to its provisions as grounds available for initiating actions against a licensee, including grounds for emergency suspension. Thus, the provision for ordering a mental examination under K.S.A. 65-2836(i) does not apply when the Board proceeds under an emergency suspension. K.S.A. 65-2838(c).

K.S.A. 65-2836(i) provides that "[i]n determining whether or not such inability exists, the board, upon reasonable suspicion of such inability, shall have authority to compel a licensee to submit to mental . . . examination . . . by such persons as the board may designate." The order for examination issues only after a formal proceeding has been initiated by the Board. It is not a punitive measure but a means given to the Board so that it will be able to make its determinations of the mental competency of the licensee. The language of the statutes contemplates that the re-

port of examination shall be admissible "at any proceeding or hearing before the board." K.S.A. 65-2836(i). Reading K.S.A. 65-2838(c), K.S.A. 65-2836(i), and K.S.A. 77-536(e) together, it is clear the legislature intended that the order for mental examination issue after commencement of a formal proceeding by the Board. We hold that an order for mental examination under the provisions of K.S.A. 65-2836(i) may issue only after the commencement of a formal proceeding in accordance with the Kansas Healing Arts Act and the Kansas Administrative Procedure Act.

Because such examination order issues under Kansas law only after commencement of a formal hearing, a licensee is provided with notice and a forum not only to question the order for examination but also to address all questions relating to any emergency suspension, if such suspension has been ordered, and to address the ultimate question involving revocation, suspension, or limitation of license.

Once an order for examination has been issued in accord with K.S.A. 65-2836(i), the refusal to submit to that examination triggers the application of K.S.A. 65-2842. This is as it should be. A forum is available to the licensee for a complete hearing on the ultimate issue of revocation, suspension, or limitation of license. The licensee's refusal to provide information, which the licensee has agreed to do under the provisions of K.S.A. 65-2836(i), and which information is essential to the Board's determination of the issue, is the licensee's choice, not the Board's. K.S.A. 65-2842 properly recognizes that if the licensee's actions frustrate the hearing process, then "the time from the date of the board's directive until the submission to the board of the report of the examination . . . shall not be included in the computation of the time limit for hearing prescribed by the Kansas administrative procedure act."

The Board hearing officer, the Board, and the district court all recognized the validity of the examination order. In this respect, all erroneously interpreted Kansas laws applicable to this case. We hold that the Board was empowered to order a mental examination under K.S.A. 65-2836 after, but not before, the commencement of a formal proceeding under the Kansas Adminis-

trative Procedure Act. Thus, the order for examination in this case was not in accord with Kansas law. The Board's reliance on K.S.A. 65-2842 for denial of a hearing to Dr. Corder on the issue of his suspension violated K.S.A. 77-536(e) and denied Dr. Corder due process of law.

The above conclusions address Dr. Corder's assigned errors I, II, and IV, all dealing with the denial of a hearing to Dr. Corder, with the exception of Dr. Corder's contention that the emergency order of March 13, 1989, was affected by reliance upon improperly admitted evidence.

The basis for the emergency suspension order was the expert testimony of Dr. Hyland. Dr. Corder contends that the testimony of Dr. Hyland was improperly admitted into evidence during the due process hearing in April 1991. The district court rejected this contention. Dr. Corder advances three reasons for the inadmissibility of Dr. Hyland's expert testimony: (1) Dr. Hyland's psychiatric assessment of Dr. Corder was based solely on Dr. Corder's religious beliefs, not on any evidence concerning how Dr. Corder actually practiced medicine; (2) Dr. Hyland's testimony was inadmissible because it did not satisfy the requirements of K.S.A. 60-456(b); and (3) Dr. Hyland's testimony was inadmissible because it was obtained through the unlawful conduct of the Board's executive director.

We have examined each of these allegations. The admission of evidence before the Board and ultimately before the trial court is a matter left to the sound discretion of the trial court. Suffice it to say that the record supports the trial court's rulings on admissibility of Dr. Hyland's expert testimony. We find no abuse of that discretion in the admission of the expert testimony of Dr. Hyland.

### Violation of Constitutional Rights of Religious Expression—Issue II

Dr. Corder contends that the Board order violated his right of religious expression because of the connection between his religious beliefs and the extraterrestrials he believed were communicating with Ms. Butts and with him through Ms. Butts. Dr.

Corder referred to Cephas, the extraterrestrial, as Peter the Apostle, and the other extraterrestrials as "angels"; he believed that this entire matter concerned the ongoing battle between good and evil.

The simple fact that there were religious connotations to Dr. Corder's statements does not mean that the Board's conduct infringed upon his right to religious expression. The trial court determined that "this view of the evidence . . . is reaching." We agree. Although it was Dr. Corder's expressed views that initially caught the Board's attention, it was Dr. Hyland's psychiatric analysis that formed the basis for the issuance of the emergency suspension order. The Board did not suspend Dr. Corder because he believed that an extraterrestrial named Cephas, also known as Peter the Apostle, contacted a woman in Russell. The action of the Board was based on evidence that Dr. Corder was psychotic and a potential danger to his patients. As noted in *Employment Div. Ore. Dept. of Human Res. v. Smith*, 494 U.S. 872, 878-79, 108 L. Ed. 2d 876, 110 S. Ct. 1595 (1990), the United States Supreme Court has "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate."

This court has determined that a state has a right to regulate, through its agencies, the practice of medicine. See *Brinkley v. Hassig*, 130 Kan. 874, 879, 289 Pac. 64 (1930). We have also determined that this authority is broad in scope. See *Vakas v. Kansas Bd. of Healing Arts*, 248 Kan. 589, 601-02, 808 P.2d 1355 (1991). The Board's temporary suspension of Dr. Corder's license to practice medicine in Kansas was based upon expert testimony that Dr. Corder was psychotic and that his delusions might influence his medical practice. Accordingly, Dr. Corder's contention that he was denied religious freedom is without merit.

Having concluded that the actions or omissions of the Board violated the provisions of K.S.A. 77-536(e) and denied Dr. Corder due process of law, we now turn to the damage issues.

Damages Under 42 U.S.C. § 1983—Issue V

Dr. Corder concedes that no liability may be imposed against

the State of Kansas for damages under the provisions of 42 U.S.C. § 1983.

He contends that he has a viable civil rights action against the executive director of the Board for damages based on his theory that the executive director deprived him of due process rights guaranteed by the Fourteenth Amendment by refusing to afford him a timely post-suspension hearing in which to challenge the emergency suspension. In denying damages, the trial court concluded that the executive director either enjoyed absolute or qualified immunity for his actions or inactions in that such actions were quasi-judicial or prosecutorial. As a final reason for denial, the trial court held that the actions of the executive director did not cause the harm giving rise to Dr. Corder's damage claim.

We agree with the trial court in its conclusion that there was a lack of causation. It is fair to say that the trial court gave careful consideration to the actions of the executive director, his statutory duties, his job description, and his relationship with the Board. In its findings and conclusions, the court found that the executive director did not, by his actions, cause the harm for which Dr. Corder claims damages under § 1983. Our review of the entire record convinces us that the trial court's findings and conclusions are supported by substantial competent evidence.

Causation is an essential element in an action for damages under 42 U.S.C. § 1983. See *Monroe v. Pape*, 365 U.S. 167, 187, 5 L. Ed. 2d 492, 81 S. Ct. 473 (1961). Liability under 42 U.S.C. § 1983 must be based both on proximate cause and cause in fact of the denial of plaintiff's constitutional rights. See 1 Nahmod, Civil Rights and Civil Liberties Litigation, The Law of Section 1983 §§ 3.24, 3.25 (3d ed. 1991).

In its decision regarding § 1983 damages against the executive director, the trial court makes the following observations:

"Plaintiff asserts, however, that it was Gannon who failed to provide him with the constitutionally mandated hearing anticipated by K.S.A. 77-536(e) on a timely basis and such omission does not permit . . . an absolute immunity defense as a matter of law for his claim for damages for this misconduct under either a federal 42 U.S.C. 1983 claim nor under the Kansas Tort Claims Act.

. . . .

"However, the Board's executive director, who derived his *actual* authority to act from the Board as opposed merely from the fact of his statutory office, seemingly cannot be so simply singled out for suit by virtue of his office alone without consideration of the source and character of the act or omission assailed and the issue of causation. Here as noted, although Gannon had preliminary hearing agenda authority, in matters of disciplinary procedures he relied on the Board's disciplinary counsel. Although it may be argued he superintended or monitored the disciplinary counsel, such superintending, given counsel's independent, direct hire position with the Board and Gannon's lack of legal training, would have to be considered, ad hoc, superficial, and theoretical at best in matters falling within the actual supposed legal competence of the disciplinary counsel who may be likened to a prosecutor. The job description for the executive director's position tactically [*sic*] recognizes these limitations. Thus, the future procedure necessarily to be followed, if any, after the disciplinary action initiated against Dr. Corder on March 13, 1989, by entry of the emergency order of suspension and order for mental examination would seem to fall squarely with the bailiwick of the disciplinary staff, specifically disciplinary counsel. . . .

"Further, Gannon, himself, as an employee of the Board of Healing Arts, was fully subject to the control of the Board and if Gannon superintended the disciplinary counsel, so also did the Board superintend both. The ultimate power of determining the need, kind, and setting for a hearing was the Board's. Thus, the omission in terms of responsibility flows directly to the Board and can be correctly said to be the decision of the Board itself albeit, at least to the December 1989 meeting, by neglect and inaction of its staff. Thus, the inherent power to decide the need for hearing may rightfully be placed with the disciplinary counsel or the Board. Seen as such, the denial of Dr. Corder's hearing by the unknowing inaction of Gannon assumes no independent culpability or force any more than if it had been initially denied consciously on presentation to the Board by way of an agenda item.

". . . Thus, it seems clear that merely to assign and place the ultimate onus of omission on Mr. Gannon's failure to place the issue of a hearing on the Board's preliminary agenda is too shallow and incorrect. This omission by Mr. Gannon was neither the causative nor unbroken reason for Dr. Corder's loss of hearing entitlement. . . .

. . . .

"The continuity and progress then of the Board's decisional process therefore would not then seemingly permit the isolation and separation out of one administrative employee whose inaction at one point would have reflected no different consequence and the actual consequence is directly attributable or imputable to the fault of persons possessing absolute immunity. . . . In any manner, the Board's ultimate position and course in regard to a hearing for Dr. Corder was not altered or deterred because Mr. Gannon failed to place any hearing request on the agenda. Gannon's posture in this suit is therefore more as a foil or lightning rod for the overriding and superseding fault of others who

are immune from suit or not sued in this proceeding. Therefore, unless it can be said that Gannon's knowledge or his administrative capacity and power had independent roots, which the evidence here does not reveal, the omission here assailed should not be attributed to him and/or should be clothed with the absolute judicial or quasi-judicial immunity of those who actually were responsible for such decision.

. . . .

"Further, Gannon's limited involvement with the decisional dynamics that ultimately resulted in the omission to accord Dr. Corder a hearing would prevent a finding that such loss was legally caused by or the fault of Mr. Gannon.

"Accordingly, Dr. Corder's claim against Richard G. Gannon for monetary damages under 42 U.S.C. 1983 should be denied."

Dr. Corder nevertheless argues that the trial court applied an incorrect causation standard in arriving at its conclusion. Relying on *Miller v. City of Mission, Kan.*, 705 F.2d 368, 375 (10th Cir. 1983), Corder asserts that the following standard calls for a different result:

" 'Moreover, personal participation is not the only predicate for section 1983 liability. Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows, or reasonably should know, would cause others to inflict the unconstitutional injury.' "

In *Miller*, a terminated assistant police chief brought civil right actions against the city, its former mayor, and several former city council members alleging deprivation of his liberty and property interests. The question centered upon whether council members caused or directly participated in the termination process. The court concluded that ample evidence supported the jury's inference that the mayor would not have dismissed Miller without a hearing absent the support and encouragement of the council members.

Unlike *Miller*, the evidence in this case would not support a conclusion that Gannon caused Dr. Corder's harm. Even applying the *Miller* causation standard, which we believe the trial court in this case did, the evidence supports the trial court's conclusion that "Mr. Gannon was neither the causative nor unbroken reason for Dr. Corder's loss of hearing entitlement." The decision whether to have a post-emergency suspension hearing was within

the discretion of the Board, and the actions of Gannon neither contributed to nor caused the Board to refuse Dr. Corder a hearing.

### Damages Under Mandamus—Issue VI

Dr. Corder filed a petition in the nature of mandamus seeking an order compelling the Board to hold a hearing in accord with K.S.A. 77-536(e). The trial court granted relief by remanding the case to the Board for the purpose of conducting a hearing in accord with K.S.A. 77-536(e) and for resolution of the question of whether Dr. Corder had waived his right to a hearing. Dr. Corder argued that his damages were caused by the failure of the Board to perform its statutory duty under K.S.A. 77-536(e). He based his damage claim upon K.S.A. 60-802(c), which provides:

"(c) *Damages.* If judgment [in the form of mandamus] be given for the plaintiff, he or she may also recover such damages as he or she may have sustained by reason of the failure of the defendant to perform the specific duty, together with costs."

The trial court determined the dollar amount of damages Dr. Corder suffered by reason of the continuation of the emergency suspension without ordering a hearing for an extended time but refused to grant damages based upon the general doctrine of governmental immunity. The court also concluded that "a public office holder in his individual capacity is shielded from damage liability under previously existing concepts of the use of mandamus against a government official by the factual absence of findings of malice, oppression in office, willful misconduct or other bad faith on his part."

We do not agree with the trial court's conclusion that the Board is shielded by governmental immunity, because the mandamus statute expressly authorizes damages against a State agency for refusal to perform its statutory duty. K.S.A. 60-802. However, we agree with the conclusion of the trial court in its refusal to grant damages. "The judgment of a trial court, if correct, is to be upheld, even though the court may have relied upon a wrong ground or assigned an erroneous reason for its decision." *Sutter Bros.*

*Constr. Co. v. City of Leavenworth,* 238 Kan. 85, 93, 708 P.2d 190 (1985).

The facts concerning this issue are not in dispute. The law, as we have held above, required the Board to hold a hearing under K.S.A. 77-536(e) on Dr. Corder's emergency suspension. Yet, as the trial court correctly observed more than once, the duty to hold a hearing was not entirely clear because of the confusion and seeming conflict between K.S.A. 65-2836(i) and K.S.A. 65-2842, of the Healing Arts Act and K.S.A. 77-536(e) of the Kansas Administrative Procedure Act.

In the case of *Arney v. Director, Kansas State Penitentiary,* 234 Kan. 257, Syl. ¶ 2, 671 P.2d 599 (1983), we said:

"It has uniformly been held that the remedy of mandamus is available only for the purpose of compelling the performance of a *clearly defined duty*; that its purpose is to require one to whom the writ or order is issued to perform some act which the law specifically enjoins as a duty resulting from an office, trust, or station; that mandamus may not be invoked to control discretion and neither does it lie to enforce a right which is in substantial dispute, and further, that resort to the remedy may be had only when the party invoking it is clearly entitled to the order which he seeks. [Citation omitted.]" (Emphasis added.)

We again said in *Tew v. Topeka Police & Fire Civ. Serv. Comm'n,* 237 Kan. 96, 697 P.2d 1279 (1985):

" 'The only acts of public functionaries which the courts ever attempt to control by either injunction or mandamus are such acts only as are in their nature strictly ministerial; and a ministerial act is one which a public officer or agent is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, and without regard to his own judgment or opinion concerning the propriety or impropriety of the act to be performed. [Citation omitted.]' " 237 Kan. at 99.

Even though Dr. Corder was granted relief in the nature of mandamus, it does not necessarily follow that damages must be awarded. The duty of the Board to order a hearing under K.S.A. 77-536(e), standing alone, is clear. The Board however, based its denial on K.S.A. 65-2842, which expressly states that "the time from the date of the board's directive until the submission to the board of the report of the examination [ordered by the board] . . . shall not be included in the computation of the time limit for hearing prescribed by the Kansas administrative procedure act."

Facially, K.S.A. 65-2842 authorized the Board to delay the hearing. There can be no doubt that had the Board initiated a formal hearing pursuant to K.S.A. 77-536(e), then ordered a mental examination and Dr. Corder refused, K.S.A. 65-2842 would have authorized the Board to delay a hearing with no due process implications.

Mandamus, as indicated above, lies when there is a clear duty. In this case, it was entirely appropriate for the trial court to order a hearing under the provisions of K.S.A. 77-536(e). However, the court itself was perplexed when it considered at length in its opinion the issuance of the two orders dated March 13, 1989, by the Board: (1) order for emergency suspension and (2) order for mental examination.

The hearing officer, Michael Barbara, clearly read the provisions of K.S.A. 65-2842 as exempting the Board from holding a hearing until Dr. Corder submitted to the mental examination. The trial court properly rejected this conclusion, noting that the effect was to deny Dr. Corder a hearing on the critical issue of his suspension. The trial court recognized the necessity of the Board to proceed with the hearing under the provisions of K.S.A. 77-536(e) but also recognized the existence of K.S.A. 65-2842. The trial court then concluded that, at the very least, Dr. Corder should have the right to question the necessity of the ordered mental examination. This line of reasoning led the trial court to the conclusion that the Board should have proceeded with the full-blown hearing on Dr. Corder's refusal to comply with the order of examination, with the idea that such a hearing would have allowed him the ability to test the order for examination in a hearing.

It can readily be seen that the operation of the two statutes seemed to create a conflict. On the one hand, K.S.A. 77-536(e) required a hearing; on the other hand, K.S.A. 65-2836(i) authorized an order for examination, and K.S.A. 65-2842 allowed the Board to delay a hearing until Dr. Corder complied with the order for examination.

In our decision, we read the two statutes together, recognizing that the examination order under K.S.A. 65-2836(i) is a statutory

aid for the Board in making a determination whether a licensee is capable of practicing in his or her profession. The ordered examination is not a punitive measure, as we have held. This order for examination under the statutory scheme may only issue after the commencement of a formal proceeding. It may not be employed outside the context of a formal hearing, as was done in this case.

When an examination is ordered after commencement of a formal hearing, the licensee is given notice and every opportunity to address not only the order for examination but also the emergency suspension, if one has been ordered. The only requirement for the issuance of an order for examination is one of probable cause. Once the Board has concluded, based on probable cause, that a licensee must submit to a mental examination, the licensee's refusal under K.S.A. 65-2842 allows the Board to delay the formal hearing until the licensee complies with the order for examination.

We agree with the trial court's conclusion that the Board's duty in this case was unclear. While a hearing was properly ordered, the grant of damages in a mandamus action is discretionary. K.S.A. 60-802(c). The denial by the trial court was appropriate because the duty in this case was not clearly defined.

Moreover, the question of damages in a mandamus action requires a consideration of the motives of the actor in failing to act. We believe that the record supports the trial count's conclusion that the Board did not act in bad faith or with malice in refusing to hold a hearing. In an early opinion discussing mandamus, *King v. Wooster*, 111 Kan. 625, 629, 208 Pac. 654 (1922), the court said:

"A state officer in the exercise of quasi-judicial power is protected 'by being relieved of cost and damages, so long as he acts reasonably and in good faith, even although he should be wrong in his refusal,' but 'should he act captiously or arbitrarily or unfairly, he becomes a wrongdoer, and subject to the liabilities of a wrongdoer.' [Citation omitted.]"

In *Barten v. Turkey Creek Watershed Joint District No. 32*, 200 Kan. 489, 512, 438 P.2d 732 (1968), we analyzed a number of prior cases of this court relative to allowing attorney fees as part of the plaintiff's damages where compliance with the duty enjoined upon a board is enforced by mandamus:

"The characterization of the wrongdoing necessary to embrace the allowance of attorneys' fees as damages in these cases gradually progresses in magnitude through the whole gauntlet of duties imposed, from the purely ministerial to those requiring the exercise of discretion and judgment. The underlying test applied seems to be whether the refusal of the public official, commission or board to perform the duty imposed by law is reasonable under all of the confronting facts and circumstances."

Under the circumstances of this case, we are not convinced that fees or damages should be ordered. The Board's duty, now clear, was confused. The Board was required to read several statutes, interpret them, and take action based upon its interpretation. Its decision to deny the hearing was based upon K.S.A. 65-2842. While its decision was wrong, it was not wholly unreasonable. Moreover, there is no evidence that the Board acted out of malice or in bad faith.

Kansas Tort Claims Act—Issue VII<br>and<br>Violation of Constitutional Rights Damage Claim—Issue VIII

Dr. Corder does not name the State of Kansas as a party defendant in his action filed on March 28, 1991, seeking relief in the form of an order of mandamus. Nor is the State of Kansas a party defendant in Dr. Corder's petition for judicial review of a final administrative order under the Kansas Judicial Review Act, K.S.A. 77-601 *et seq.*

The Board, before the trial court and now on appeal, contends that the trial court had no jurisdiction to award damages under the Kansas Tort Claims Act because the legislature has not granted the Board the capacity to be sued. *Hopkins v. State*, 237 Kan. 601, 606, 702 P.2d 311 (1985).

Dr. Corder responds that the Board has sued and been sued in a number of reported cases over the years. In support of this position, he cites the following cases: *Vakas v. Kansas Bd. of Healing Arts*, 248 Kan. 589, 808 P.2d 1355 (1991) (petition for judicial review filed by doctor following refusal of the board to reinstate him after his license had been revoked); *Kansas State Board of Healing Arts v. Acker*, 228 Kan. 145, 612 P.2d 610 (1980) (appeal by doctor from district court's decision upholding a decision of

the board to suspend his license to practice medicine); *Acupuncture Society of Kansas v. Kansas State Bd. of Healing Arts*, 226 Kan. 639, 602 P.2d 1311 (1979) (appeal from a ruling in a declaratory judgment action prohibiting chiropractors from using acupuncture in treating their patients); *Kansas State Board of Healing Arts v. Seasholtz*, 210 Kan. 694, 504 P.2d 576 (1972) (appeal from judgment of district court sustaining an order of the board revoking the license of doctors to practice medicine); *Kansas State Board of Healing Arts v. Foote*, 200 Kan. 447, 436 P.2d 828 (1968) (appeal by the board from a district court order reversing the board's revocation of a medical license); *Brinkley v. Hassig*, 130 Kan. 874, 289 Pac. 64 (1930) (action by doctor to enjoin board from holding a hearing on subject of revocation of license to practice medicine and surgery); *Jones v. Board of Medical Examination*, 111 Kan. 813, 208 Pac. 639 (1922) (appeal from denial of writ of mandamus to compel board to permit doctor to take examination for licensure); and *Meffert v. Medical Board*, 66 Kan. 710, 72 Pac. 247 (1903) (appeal from district court order enforcing board's order of license revocation), *aff'd* 195 U.S. 625, 49 L. Ed. 350, 25 S. Ct. 790 (1904).

All of the above cases have two things in common: (1) None of the cases involve claims for damages; and (2) all cases involve the regulation of the practice of the healing arts in Kansas. K.S.A. 65-2801 sets forth the purpose of the Kansas Healing Arts Act:

"Recognizing that the practice of the healing arts is a privilege granted by legislative authority and is not a natural right of individuals, it is deemed necessary as a matter of policy in the interests of public health, safety and welfare, to provide laws and provisions concerning the granting of that privilege and its subsequent use, control and regulation to the end that the public shall be properly protected against unprofessional, improper, unauthorized and unqualified practice of the healing arts and from unprofessional conduct by persons licensed to practice under this act."

K.S.A. 65-2812 creates the Board "[f]or the purpose of administering the provisions of this act." Powers granted to the Board are specifically limited to "provisions concerning the granting of that privilege [practice of the healing arts] and its subsequent use, control and regulation" of the practice. K.S.A. 65-2801. Dr. Corder does not cite any authority within the Kansas Healing

Arts Act whereby the Board has been given the power to sue or be sued. The legislature has not granted this authority except in the limited area of regulation of the practice of the healing arts.

Dr. Corder contends that K.S.A. 65-2866 grants the Board such authority, but the express provisions of this statute undermine his contention:

"Upon the request of the board, the attorney general or county or district attorney of the proper county shall institute in the name of the state or board the proper proceedings against any person regarding whom a complaint has been made *charging him or her with the violation of any of the provisions of this act*, and the attorney general, and such county or district attorney, at the request of the attorney general or of the board shall appear and prosecute any and all such actions." (Emphasis added.) K.S.A. 65-2866.

The power granted is limited to "violation of any of the provisions of this act." The law simply does not confer on the Board the capacity to sue or be sued.

*Hopkins v. State*, 237 Kan. 601, discusses the statutory grant of capacity to sue or be sued. In *Hopkins*, the Kansas Highway Patrol was sued under the Kansas Tort Claims Act for negligence in the apprehension of an intruder who had occupied the plaintiffs' mobile home. In their original action, the plaintiffs failed to name the State of Kansas as a party defendant. Plaintiffs filed a motion to amend and to add the State. The defendant, the Kansas Highway Patrol, filed a motion to dismiss, arguing that it did not have the capacity to sue or be sued. The trial court orally granted plaintiffs' motion to add the State and granted the Kansas Highway Patrol's motion to dismiss. Plaintiffs, on appeal, contended that the Kansas Highway Patrol, as an executive agency of the State under the Kansas Tort Claims Act, is a proper defendant in the action and asked that it be reinstated. 237 Kan. at 605-06.

We responded to this argument by holding that the trial court correctly dismissed the Kansas Highway Patrol:

"K.S.A. 75-6103 subjects each governmental entity to liability for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state. K.S.A. 75-6102(c) defines a governmental entity as a state or municipality. K.S.A. 75-6102(a) defines state to include the State of Kansas *and* (not

*or*) any department or branch of state government, or any agency, authority, institution or other instrumentality thereof. The trial judge determined the court lacked jurisdiction over the KHP and stated:

> 'The legislature may create a separate governmental entity with the capacity to sue and be sued but such authority must be expressly created. *Murphy v. City of Topeka*, 6 Kan. App. 2d, 488 at 491. K.S.A. 74-2105 *et seq.*, contains no such authority. The Kansas Tort Claims Act deals only with the subject matter of liability of the State and its entities as they might exist. It does not undertake to change the governmental organization or structure nor the nature or capacity of any of the State's instrumentalities.'

"There is a line of Kansas cases which holds that subordinate government agencies do not have the capacity to sue or be sued in the absence of statute. One of the first of these was *Dellinger v. Harper County Social Welfare Board*, 155 Kan. 207, 124 P.2d 513 (1942). There a physician attempted to sue the county welfare board to recover fees for services he provided to indigents. It was determined that county welfare boards created under the provisions of the social welfare act do not, under the general powers given to them by statute, have legal capacity to conduct or defend litigation. See *Erwin v. Leonard*, 166 Kan. 630, 203 P.2d 207 (1949); *In re Estate of Butler*, 159 Kan. 144, 152 P.2d 815 (1944); *Murphy v. City of Topeka*, 6 Kan. App. 2d 488, 630 P.2d 186 (1981).

"K.S.A. 74-2105 *et seq.* establishes the functions, duties and powers of the Kansas Highway Patrol. None of the statutes grant the Patrol the capacity to sue or be sued.

"In contrast, one can look at the statutes which created the Kansas Turnpike Authority, now K.S.A. 1984 Supp. 68-2004, and the Kansas Highway Commission, G.S. 1929, 68-419. As pointed out in *Anderson Cattle Co. v. Kansas Turnpike Authority*, 180 Kan. 749, 755, 308 P.2d 172 (1957), both agencies were statutorily given the capacity to sue and be sued. The district court was correct in determining that the KHP had not been granted the power to sue or be sued." 237 Kan. at 606-07.

Dr. Corder nevertheless argues that the Board is subject to liability for damages under the Kansas Tort Claims Act because of K.S.A. 65-2851a, which provides that all actions affecting any licensee under the Act "shall be conducted in accordance with the provisions of the Kansas administrative procedure act." He argues that K.S.A. 77-622 of the Kansas Judicial Review Act authorizes imposition of damages against the Board under the Kansas Tort Claims Act.

K.S.A. 77-622 provides:

"(a) The court may award damages or compensation only to the extent expressly authorized by another provision of law.

"(b) The court may grant other appropriate relief, whether mandatory, injunctive or declaratory; preliminary or final; temporary or permanent; equitable or legal. In granting relief, the court may order agency action required by law, order agency exercise of discretion required by law, set aside or modify agency action, enjoin or stay the effectiveness of agency action, remand the matter for further proceedings, render a declaratory judgment or take any other action that is authorized and appropriate.

"(c) The court may also grant necessary ancillary relief to redress the effects of official action wrongfully taken or withheld, but the court may award attorney's fees or witness fees only to the extent expressly authorized by other law.

"(d) If the court sets aside or modifies agency action or remands the matter to the agency for further proceedings, the court may make any interlocutory order it finds necessary to preserve the interests of the parties and the public pending further proceedings or agency action."

According to Dr. Corder's argument, a claim for damages under the Kansas Tort Claims Act may be advanced because of the very broad remedy provisions contained in K.S.A. 77-622. Dr. Corder relies on a statement contained in Professor Ryan's Kansas Administrative Law treatise:

"The universal applicability of this [Kansas Judicial Review Act] is reinforced by its globally stated remedy provision. *Except for damages or compensation, which may only be awarded when expressly authorized by another specific agency enabling act provision, the court may grant any other appropriate relief in virtually all forms conceptually available, including mandatory or injunctive relief, declaratory, preliminary or final relief, equitable or legal relief.*" (Emphasis added.) Ryan, Kansas Administrative Law With Federal References § 22.12, p. 22-7 (3d ed. rev. 1991).

According to Professor Ryan's statement, the "globally stated remedy provision" does not apply to damages or compensations, the very remedy Dr. Corder seeks.

The trial court also concluded that no viable action for damages exists against the Board for it "has no authority to sue or be sued except in enforcement of its own administrative orders." The trial court observed:

"Fundamentally, the court believes Dr. Corder's asserted state law damage remedies against the Board are exclusively controlled by the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq.* As a state agency, the Board has no authority to sue or be sued except in enforcement of its own administrative orders. See, K.S.A. 77-624 *et seq.* Accordingly, the KAJR remedies are exclusive. See, K.S.A. 77-606; *Kansas Sunset As-*

*socs. v. Kansas Dept. of Health & Environment*, 16 Kan. App. 2d 1 (1991). Accordingly, unless some substantive right to recover damages is authorized by other statute, then no such right exists enforceable through the KAJR (See, K.S.A. 77-622[a] and [c]) or independently. . . . However, none of the state damage remedies asserted except under his mandamus claim find a source in state statute. Hence, no immunity waiver for these damage claims exist."

Since the Board has not been granted the power by statute to sue or be sued, the court had no jurisdiction to award Dr. Corder damages on any of his damage claims, including his asserted claim for damages for violation of constitutional rights asserted in issue VIII.

Moreover, when Dr. Corder claims damages against the executive director of the Board, both individually and in his official capacity, we agree with the trial court in its holding that "everything [the executive director] was alleged to have done or not done was under the authority he held in his official capacity as executive director of the Board of Healing Arts. Once this fact of official capacity is established, the exclusivity of the KAJR attaches as the remedies for any grievance from Mr. Gannon's [executive director's] action or inaction as well."

Finally, under any damage claim asserted against the executive director, our holding that Gannon did not cause the harm to Dr. Corder applies to all tort actions asserted by Dr. Corder. In the absence of causation, tort damages are not available against Gannon.

### Cross-Appeal and Attorney Fees Award Under 42 U.S.C. § 1988—Issue IX

Dr. Corder's action against the Board and its executive director under 42 U.S.C. § 1983 was an "official capacity" action. See *Kentucky v. Graham*, 473 U.S. 159, 87 L. Ed. 2d 114, 105 S. Ct. 3099 (1985). This action was one for damages and for attorney fees. In Dr. Corder's § 1983 action, there can be no question that his action against the Board was an official capacity action. While Dr. Corder advances a personal action and an official capacity action against the executive director, we have determined, as did the trial court, that there is no merit to his claim based upon the personal action against the executive director.

As to Dr. Corder's claims for damages and attorney fees under § 1983 and § 1988, he is not entitled to damages or attorney fees because the actions of both the Board and executive director were in their official capacity. Under these circumstances, the actions were the actions of the State; the State is not "a person" within the meaning of § 1983 in such a damages action. Since Dr. Corder could never "prevail" against the State in such an action, he is not entitled to fees for his damages action under § 1988.

Dr. Corder, however, concedes that the State is not considered a "person" in a damages action under § 1983 but argues that a state official in his or her official capacity, when sued for injunctive relief, is a "person" under § 1983. He argues that since he sought injunctive relief in his action against the Board and its executive director in their official capacity and received relief in the form of a hearing from the district court, he is entitled to attorney fees under § 1988 as the "prevailing" party.

Dr. Corder relies on two sources for his contention that a state official in his or her official capacity is considered a "person" where injunctive relief is sought.

In *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 105 L. Ed. 2d 45, 109 S. Ct. 2304 (1989), the Court concluded that while state officials literally are persons, a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. "As such, it is no different from a suit against the State itself." 491 U.S. at 71. However, *Will*, in a footnote to the opinion, states:

"Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.' *Kentucky v. Graham*, 473 U.S., at 167, n. 14; *Ex parte Young*, 209 U.S. 123, 159-160 (1908). This distinction is 'commonplace in sovereign immunity doctrine,' L. Tribe, American Constitutional Law § 3-27, p 190, n. 3 (2d. ed 1988), and would not have been foreign to the 19th-century Congress that enacted § 1983 [citations omitted]." 491 U.S. at 71, n.10.

Dr. Corder next relies on our case of *Darling v. Kansas Water Office*, 245 Kan. 45, 54, 774 P.2d 941 (1989), wherein we said: "State agencies, therefore, are considered 'persons' under § 1983 where injunctive relief is involved."

We have considered the above authorities but need not resolve the question of whether the Board or its executive director is a "person". Assuming arguendo that Gannon or the Board, as a state agency, are persons under § 1983, we must deny Dr. Corder's claim for attorney fees.

Dr. Corder was not a prevailing party based upon the record, his claims, and the relief granted by the trial court.

The trial court stated that it awarded attorney fees because "clearly Dr. Corder has prevailed on his federal claim validating and mandating a hearing," citing *Pulliam v. Allen,* 466 U.S. 522, 80 L. Ed. 2d 565, 104 S. Ct. 1970 (1984).

Both 42 U.S.C. § 1988 and *Pulliam* condition the availability of attorney fees on a successful civil rights action pursued under federal law. 42 U.S.C. § 1988 permits a court to award attorney fees to a prevailing party in "any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318 . . ., or title VI of the Civil Rights Act of 1964." *Pulliam* also notes that attorney fees should "be available in any action to enforce a provision of § 1983." 466 U.S. at 543.

The trial court's order that the Board afford Dr. Corder a hearing was not, according to the record before us, the result of a successful § 1983 action. Dr. Corder did not seek the hearing pursuant to § 1983, nor did he claim that the failure to provide a hearing gave rise to a § 1983 claim.

In Counts I through IV of the amended petition, Dr. Corder seeks "an order of mandamus . . . commanding the Board to comply with the Kansas Administrative Procedure Act in all future dealings with Dr. Corder."

The only reference to § 1983 in Dr. Corder's petition is found in Count IV, in which he sought an order enjoining the defendants "from curtailing the religious expression of Dr. Corder as a precondition to issuing or reinstating his license . . . [and] from requiring him to submit to psychiatric and psychological examinations as a result of his religious expression." It was within this context that Dr. Corder sought his attorney fees. Although Dr. Corder mentions the failure to provide a hearing, it is only

in the context of his claim that the Board violated his right of religious expression without due process. Dr. Corder did not prevail on his claim that the Board violated his right of religious expression.

The trial court's April 5, 1991, order requiring a hearing, upon which the court based its attorney fee award, does not reference 42 U.S.C. § 1983. This order required the Board to conduct a hearing because K.S.A. 77-536(e) required it. Thus, Dr. Corder did not request injunctive relief under § 1983, nor did the court grant such relief under § 1983. While the trial court's order for fees speaks of the rights vindicated in Dr. Corder's § 1983 action, relief in the form of a hearing was not requested under § 1983, nor did the court grant a hearing under the provisions of § 1983.

Instead, the claim upon which Dr. Corder prevailed was a mandamus action for compliance with K.S.A. 77-536(e). This does not qualify as the kind of prospective, injunctive relief to which a remedy could be gained under 42 U.S.C. § 1983. Contrary to the trial court's decision, the record does not support the conclusion that Dr. Corder prevailed on a 42 U.S.C. § 1983 claim. Accordingly, the grant of attorney fees under 42 U.S.C. § 1988 is reversed.

Affirmed in part and reversed in part.