No. 112,429

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

VERNON A. BURNETTE and GAIL BURNETTE,
as the Heirs-at-Law of
VERNON "JOEL" BURNETTE, Deceased,
and VERNON A. BURNETTE, as the Personal Representative of the Estate of
VERNON "JOEL" BURNETTE, Deceased,
*Appellees*,

v.

KIMBER L. EUBANKS, M.D.,

and

PAINCARE, P.A.,
*Appellants*.

SYLLABUS BY THE COURT

1.

A party who contributes to a wrongful death is a cause of that death as contemplated by the wrongful death statute.

2.

The wrongful death statute expresses the policy that a party can recover for wrongful death. The law of comparative negligence controls how that party can recover for wrongful death.

3.

Recognizing that there are many forces that can create harm in a single incident, the legislature embraced comparative negligence as a means for just compensation for negligent wrongs.

1

4.

By directing the imputation of a decedent's fault to the party claiming wrongful death damages, it is clear that the legislature intended that wrongful death recovery should be governed by comparative fault principles.

5.

The wrongful death statute and the statutes dealing with comparative negligence must be interpreted with a view of making them work in harmony in order to achieve the goals of both pieces of legislation.

6.

Kansas follows the traditional concept of proximate cause, *i.e.*, individuals are not responsible for all *possible* consequences of their negligence but only those consequences that are *probable* according to ordinary and usual experience.

7.

"Proximate cause" is that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act.

8.

A party preserves an instruction error claim on appeal by timely objecting at trial and by stating the grounds for the objection.

9.

When raising new grounds challenging an instruction, the issue is treated as a failure to object to the instruction and clear error analysis applies.

10.

A clear error determination must review the impact of the erroneous instruction in light of the entire record including the other instructions, counsel's arguments, and whether the evidence is overwhelming.

Appeal from Johnson District Court; PAUL C. GURNEY, judge. Opinion filed May 27, 2016. Affirmed.

*Steven C. Day* and *Christopher S. Cole*, of Woodard, Hernandez, Roth & Day, LLC, of Wichita, and *Bruce Keplinger* and *Christopher Lucas*, of Norris & Keplinger, LLC, of Overland Park, for appellants.

*John M. Parisi*, *Scott E. Nutter,* and *Daniel A. Singer*, of Shamberg, Johnson & Bergman Chartered, of Kansas City, Missouri, and *Michael W. Blanton*, of Blanton Law Firm, of Evergreen, Colorado, for appellees.

Before GARDNER, P.J., HILL and POWELL, JJ.

HILL, J.: In the third year of the pendency of his medical malpractice lawsuit, Joel Burnette killed himself. His heirs and his estate are now pursuing a wrongful death claim. They received a money judgment after a jury found a doctor, Kimber Eubanks, M.D., and a clinic, PainCARE, P.A., negligent.

The doctor and the Clinic appeal, contending the trial court improperly instructed the jury because its causation instruction said: "A party is at fault when he or she is negligent and that negligence caused or contributed to the event which brought about the claim(s) for damages." In their view, this instruction is erroneous when applied to wrongful death cases because the statute authorizing wrongful death claims only states "caused" and does not use the phrase "contributed to."

3

Recovery for negligence in Kansas is governed by principles of comparative negligence. We hold that in wrongful death claims, one who contributes to a wrongful death is a cause of that death as contemplated by the wrongful death statute. We reject any construction of the wrongful death statute to mean that only those who are the sole cause of a wrongful death can be pursued for damages under the wrongful death statute.

We must also address questions of the admissibility of certain opinion evidence and the request for a certain type of damage. Additionally, we examine the propriety of allowing an exhibit to be taken back with the jury during its deliberations and a brief reference to insurance made during the voir dire examination of potential jurors. In the end, we affirm.

*Joel sought relief at a pain clinic.*

In May 2008, Vernon "Joel" Burnette sought treatment at PainCARE, P.A., for his chronic lower back pain. We will refer to The PainCARE, P.A., as the Clinic. Subsequently, Dr. Daniel Bruning treated Joel with steroid injections to the facet joints on the right side of Joel's back at several thoracic and lumbar vertebrae. Dr. Bruning saw Joel again on December 15, 2008, where he performed additional facet joint injections on the right side, together with a piriformis muscle injection.

A little over a month later, Joel returned to the Clinic. This time Dr. Kimber Eubanks performed an epidural steroid injection and bilateral trochanteric bursa injections in the L5-S1 area.

On January 12, 2009, Erich Helfer, a physical therapist at the Clinic, performed a physical therapy assessment on Joel. Helfer's notes indicated the presence of kyphosis and edema on Joel's back between the L4 and S1 vertebrae. Kyphosis is a change in the bony alignment of the spine itself. Edema means swelling or fluid retention in a certain

4

region of the body and can indicate the possibility of an infection. The next day, Joel returned to see Dr. Eubanks at the Clinic. Dr. Eubanks performed an L5-S1 epidural steroid injection on the right side of Joel's spine.

Just a week later, on January 21, 2009, Joel went to the emergency room at St. Luke's Hospital suffering from fever, headache, and a stiff neck. Dr. Sarah Linderman performed a lumbar puncture seeking a spinal fluid specimen, which produced green, cloudy puss. Evidently, the epidural steroid injection to Joel's back had passed through the edema, which was infected, causing the infection to spread. As a result, Joel contracted bacterial meningitis—an inflammation of the meninges covering the spinal cord. This developed into arachnoiditis, an incurable disease of the central nervous system. The arachnoiditis caused many problems for Joel. He suffered from pain, and he had problems with his balance, bowel function, gait, and walking. It produced dizziness, fatigue, and sexual dysfunction.

*Joel seeks legal compensation.*

In December 2010, Joel filed a medical negligence claim against Dr. Eubanks, Dr. Bruning, and the Clinic alleging that the negligent treatment by all three caused his injuries and damages. Dr. Bruning was later dismissed from the lawsuit.

Joel's negligence claims can be condensed into two theories. Dr. Eubanks was negligent by giving Joel a lumbar steroid injection despite signs and symptoms of a localized infection. By pushing the needle through the infection and beneath the dura, the infection was spread into Joel's spinal fluid and resulted in arachnoiditis. The Clinic was liable through the negligence of its employee, Erich Helfer, the therapist who was negligent when he failed to report to Dr. Eubanks the presence of kyphosis and edema on Joel's back. Also, the nursing staff failed to note Joel's reports of a raised or swollen area on his lower back.

5

As the case slowly progressed, Joel committed suicide on February 12, 2013. He left a note to his parents, which revealed that he was taking his life because he "couldn't live one more day with this pain." Joel further stated, "I tried. So damn hard. I tried. For three long years I tried. And now, I'm tired. So tired. Tired of the pain. Tired of the frustration. Tired of failing. Tired. So very, very tired."

Eventually, the trial court substituted Joel's heirs—his parents—Vernon and Gail Burnette, and his estate as successor plaintiffs in the lawsuit. They, in turn, filed an amended petition asserting a wrongful death claim, contending that Joel committed suicide due to pain associated with the arachnoiditis he suffered following the substandard treatment by Dr. Eubanks and the Clinic.

Before trial, Helfer, the therapist at the Clinic, acknowledged during his deposition that notes of his January 12, 2009, treatment of Joel, which he considered accurate, indicated the presence of an area of kyphosis and edema on Joel's back between the L4 and S1 vertebrae. On an anatomical drawing of the back, marked as deposition exhibit 5, Helfer drew two circles in the L4-S1 areas in which he observed kyphosis and edema on Joel's back. Defense counsel objected on the basis of speculation but clarified that to the extent the markings were an "approximation" there was no objection. When asked, Helfer described a red circle he had marked on Exhibit 5 as "the circle where I, based on the evaluation, saw the edema between L4 and S1." Helfer clarified that he remembered the edema on Joel's back was located between L4 and S1 in terms of the upper and lower limits of Joel's spine, but he did not recall its location laterally and the circle he had drawn on Exhibit 5 depicting the area of edema was a "general approximation."

*We recount some pertinent trial events.*

Dr. Eubanks and the Clinic sought to exclude Exhibit 5 from Helfer's deposition from admission into evidence at trial on the basis that the markings on Exhibit 5 were

6

based solely upon Helfer's review of his notes, not upon his independent recollection. Helfer had admitted the marks he made might not have accurately shown how far the edema extended laterally. The district court denied the motion to exclude Exhibit 5, finding that it was not improper for Helfer to rely on his notes to mark on the drawing and that any argument regarding how far the edema extended laterally was an argument for the jury.

During voir dire questioning, a prospective juror made an unsolicited comment regarding insurance. Defense counsel moved to strike the entire venire panel. The district court removed the prospective juror, gave a limiting instruction, and denied the motion to strike the panel. When Helfer testified at trial, Exhibit 5 from Helfer's deposition was marked as Plaintiffs' Exhibit 114 and admitted over defense counsel's objection. Plaintiffs' Exhibit 114 was displayed during trial and allowed to go to the jury room during the jury's deliberations.

The jury returned a verdict finding for the Burnettes on liability, assessing 75 percent of the fault to Dr. Eubanks and 25 percent to the Clinic. No fault was attributed to Joel. The jury awarded total damages of $2,060,317.84 (medical expenses: $465,757.84; economic loss [lost income]: $134,560; noneconomic loss: $1,460,000) to Joel's estate, and $820,062 (past loss [of] attention, care, and loss of a complete family: $50,000; future loss of attention, care, and loss of a complete family: $500,000; funeral expenses: $20,062; past noneconomic loss: $50,000; future noneconomic loss: $200,000) in total damages to the Burnettes.

After applying the $250,000 statutory damage cap under K.S.A. 60-19a02(d) to the jury's award of $1,460,000 for the noneconomic loss suffered by Joel's estate, the district court entered judgment in favor of Joel's estate against Dr. Eubanks for $637,738.38 and against the Clinic for $212,579.46. The district court entered judgment

7

in favor of the Burnettes against Dr. Eubanks for $615,046.50 and against the Clinic for $205,015.50.

*We reject the claim that one who contributes to a wrongful death is not liable for that death.*

Dr. Eubanks and the Clinic contend that the trial court must be reversed because it instructed the jury in this case that a "party is at fault when he or she is negligent and that negligence caused or contributed to the event which brought about the claims for damages." In their view, that statement of the law is inaccurate when dealing with wrongful death actions. They base their argument on K.S.A. 2015 Supp. 60-1901(a). It simply states:

> "If the death of a person is caused by the wrongful act or omission of another, an action may be maintained for the damages resulting therefrom . . . ."

Dr. Eubanks and the Clinic argue that the wrongful death statute limits liability only to those who cause a wrongful death and does not extend to those who contribute to the death. Contending this is a plain language question, they argue this means such actions must be limited to those instances when there is but one cause of the wrongful death.

The wrongful death statute expresses the policy that one can recover for wrongful death. The law of comparative negligence controls how one can recover for wrongful death.

In Kansas, recovery for various types of losses is controlled by the various laws that govern actions arising from that type of loss. Thus, motor vehicle negligence actions are controlled by motor vehicle law. Product liability actions are controlled by the laws dealing with product liability. Medical negligence claims are controlled by the law of

8

medical negligence. The wrongful death statute controls none of these subjects even though death can be a result in all of those cases.

A brief review of comparative negligence law is helpful here. Its enactment took Kansas tort law into a new direction. One of the results of enacting comparative negligence in 1974 was that plaintiffs are now not barred from recovery for their injuries and damages if they are negligent as they would have been in the days when the doctrine of contributory negligence was the law of the land. Also, the doctrine of joint and several liability among joint tortfeasors is now extinct. Under that doctrine, a joint tortfeasor could be responsible for all of the damages even though his or her negligence was less than that of another wrongdoer.

The new doctrine erased the old. The law was a comprehensive reform. With comparative negligence, damages are awarded on the basis of a tortfeasor's percentage of fault. One is responsible for the amount of harm he or she caused and not more. See *Brown v. Keill*, 224 Kan. 195, 197, 580 P.2d 867 (1978).

Recognizing that there are many forces that can create harm in a single incident, the legislature embraced comparative negligence as a means for just compensation for negligent wrongs. Indeed, the Supreme Court has held rights and liabilities should be determined in one action:

> "[T]he Kansas comparative negligence act is a multipurpose act which goes far beyond a basic comparison of the contributing negligence of each of the parties to the cause of an accident or injury. The act comprehensively provides machinery for drawing all possible parties into a lawsuit to fully and finally litigate all issues and liability arising out of a single collision or occurrence, and apportion the amount of total damages among those parties against whom negligence is attributable in proportion to their degree of fault.
>     "[W]e believe it was the intent of the legislature to fully and finally litigate all causes of action and claims for damage arising out of any act of negligence subject to

9

K.S.A. 60-258a. The provision for determining the percentage of causal negligence against each person involved in a negligence action contemplates that the rights and liabilities of each person should be determined in one action." *Eurich v. Alkire*, 224 Kan. 236, 237-38, 579 P.2d 1207 (1978).

The comparative negligence statute, K.S.A. 2015 Supp. 60-258a(a), states:

"The contributory negligence of a party in a civil action does not bar that party or its legal representative from recovering damages for negligence resulting in death, personal injury, property damage or economic loss, if that party's negligence was less than the causal negligence of the party or parties against whom a claim is made . . . ."

In fact, that statute goes on to direct that "[i]f a party claims damages for a decedent's wrongful death, the negligence of the decedent, if any, must be imputed to that party."

Clearly then, that statute shows the legislature intended that wrongful death recovery should be governed by comparative fault principles. The only bar to recovery that remains is if the decedent's negligence is greater than the causal negligence of the other parties to the incident that resulted in the death.

Caselaw recognizes that comparative fault law applies in wrongful death cases. See *Siruta v. Siruta*, 301 Kan. 757, 775, 348 P.3d 549 (2015). In addition, it applies in wrongful death medical malpractice actions. See *Maunz v. Perales*, 276 Kan. 313, 326, 76 P.3d 1027 (2003).

Dr. Eubanks and the Clinic invite us to err. If we were to agree with them, it would mean, in a practical sense, that there could never be any recovery for a wrongful death when there are complex facts and several different forces are engaged in an incident that results in death. Accumulated wrongs can cause a death just as surely as one.

10

Does this mean only one tortfeasor can be held responsible? If we were to adopt the view urged upon us by Dr. Eubanks and the Clinic, it would. If several people contribute to a wrongful death, none would be legally responsible because they could not be the sole cause of death, even though all contributed to the death.

We do not share this limited view of the wrongful death statute that isolates it from our primary system of recovery for negligence—comparative fault. Dr. Eubanks and the Clinic ask us to ignore 30 years of precedent and reverse the district court. This we will not do.

We must interpret the wrongful death statute and those dealing with comparative negligence with a view of making them work in harmony in order to achieve the goals of both pieces of legislation. When construing statutes to determine legislative intent, we do so with a view of reconciling and bringing all provisions into workable harmony if possible. *Friends of Bethany Place v. City of Topeka*, 297 Kan. 1112, 1123, 307 P.3d 1255 (2013).

A look at the language used here persuades us further to reject Dr. Eubanks' theory. Black's Law Dictionary 265 (10th ed. 2014) defines contributing cause as "a factor that—though not the primary cause—plays a part in producing a result." If we employ that definition in this case, the jury must have concluded that the negligence of the Clinic employees and the negligence of Dr. Eubanks were contributing causes. That is, both played a part in producing the arachnoiditis which led to Joel's death.

We hold that a contributing cause is a cause as the term is used in the wrongful death statute, K.S.A. 60-1901. In other words, if your negligence contributes to the cause of death and it is foreseeable, then you can be held liable for that death in proportion to your percentage of fault.

11

*We see no error in the jury instruction used by the court on this point.*

Dr. Eubanks asserts that the district court erred by using language from PIK Civ. 4th 105.01 in Instruction No. 11 which defined the causation element for the Burnettes' medical malpractice claim seeking wrongful death damages. He acknowledges that the issue presented here on appeal only "involves the legal appropriateness of the instruction." Thus, this issue centers solely on whether Instruction No. 11 accurately stated the law.

Appellate courts employ a four-step inquiry when addressing challenges to jury instructions. First, this court exercises unlimited review over questions of appellate jurisdiction and issue preservation. Second, we have unlimited review to determine whether the instruction was legally appropriate. Third, if this court finds the instruction was legally appropriate, we look to the record in the light most favorable to the requesting party to determine whether sufficient evidence supported giving the instruction. Finally, if the district court erred, we determine whether the error was harmless under *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). See *Foster v. Klaumann*, 296 Kan. 295, 301-02, 294 P.3d 223 (2013).

Basically, a trial court is required to give an instruction supporting a party's theory of the case if there is sufficient evidence supporting the theory. *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 419, 228 P.3d 1048 (2010). This means that in order for the Burnettes to establish Dr. Eubanks' and the Clinic's responsibility, they had to establish a prima facie case of negligence.

As with all negligence cases, the Burnettes' burden began with their obligation to establish that Dr. Eubanks and the Clinic owed a duty to Joel. See *Miller v. Johnson*, 295 Kan. 636, Syl. ¶ 15, 289 P.3d 1098 (2012). The district court relied on PIK Civ. 4th 123.12 (Duty of Medical Specialist) and PIK Civ. 4th 123.01 (Duty of Health Care

Provider) in Instruction Nos. 13 and 14, respectively, to inform the jury about the applicable standards of care for each party and that a violation of this standard constituted negligence.

To explain the causation element of the case to the jury, the Burnettes requested an instruction on fault identical to Instruction No. 11 ultimately given by the district court. Instruction No. 11 is identical to the PIK instruction's definition for "fault" found in PIK Civ. 4th 105.01, entitled, "Comparative Fault Theory and Effect." Specifically, the district court instructed the jury: "A party is at fault when he or she is negligent and that negligence *caused or contributed* to the event which brought about the claim(s) for damages." (Emphasis added.)

The Notes on Use to PIK Civ. 4th 105.01 state: "This instruction should be used in every comparative fault case." Instruction No. 12 mirrored the PIK instruction for explaining the verdict in a comparative fault case—PIK Civ. 4th 105.03—or to which parties the jury could assign fault—Dr. Eubanks, the Clinic, or both. The Notes on Use for this PIK instruction state that this instruction "applies to all causes of action where there is a question of more than one of the parties being negligent." PIK Civ. 4th 105.03, Notes on Use.

A legally appropriate instruction fairly and accurately states the applicable law when viewed in isolation and is supported by the particular facts of the case. *Dickerson v. Saint Luke's South Hospital, Inc.*, 51 Kan. App. 2d 337, 348, 346 P.3d 1100 (2015) (citing *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 [2012]). This court exercises unlimited review when deciding whether the instruction was legally erroneous. See *Foster*, 296 Kan. at 301.

Dr. Eubanks points out that the wrongful death statute, K.S.A 60-1901, speaks in terms of "caused" and does not specifically use the phrase "caused or contributed." That

13

statute provides: "If the death of a person is *caused* by the wrongful act or omission of another, an action may be maintained for the damages resulting therefrom if the former might have maintained the action had he or she lived . . . ." (Emphasis added.) K.S.A 60-1901.

In his challenge to Instruction No. 11, Dr. Eubanks argues that the PIK Civil Advisory Committee's decision to include the word "contributed" in the definition of fault resulted in "a fatally flawed statement of the rules of proximate cause" in wrongful death cases arising from allegations of medical malpractice. This is based on the fact that the verb "contributed" is not used in the wrongful death statute; only the verb "caused" is used.

Some legal base points need to be set here. Kansas follows the traditional concept of proximate cause, *i.e.*, "individuals are not responsible for all *possible* consequences of their negligence, but only those consequences that are *probable* according to ordinary and usual experience." *Hale v. Brown*, 287 Kan. 320, 322, 197 P.3d 438 (2008); accord *Sly v. Board of Education*, 213 Kan. 415, 424, 516 P.2d 895 (1973).

Kansas appellate courts have consistently defined "proximate cause" as that cause which "in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act." *Idbeis v. Wichita Surgical Specialists*, 285 Kan. 485, 499, 173 P.3d 642 (2007).

This traditional statement of proximate cause incorporates concepts that fall into two categories: causation in fact and legal causation. See, *e.g.*, *Corder v. Kansas Board of Healing Arts*, 256 Kan. 638, 655, 889 P.2d 1127 (1994); *Hammig v. Ford*, 246 Kan. 70, 72, 785 P.2d 977 (1990). To prove causation in fact, a plaintiff must prove a cause-and-effect relationship between a defendant's conduct and the plaintiff's loss by

14

presenting sufficient evidence from which a jury could conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred. See *Baker v. City of Garden City*, 240 Kan. 554, 559, 731 P.2d 278 (1987).

To prove legal causation, the plaintiff must show that it was foreseeable that the defendant's conduct might create a risk of harm to the victim and that the result of that conduct and contributing causes were foreseeable. *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 421, 228 P. 3d 1048 (2010).

That is what the Burnettes proved here—causation in fact and legal causation. The ultimate question the jury had to decide here was whether Joel's death was a result of Dr. Eubanks' negligence, the Clinic's negligence, or both. The Burnettes alleged two parties were at fault. Certainly then, within the context of the jury's assessment of comparative fault, the use of the word "contributed" is appropriate. We are mindful that the jury here could have found Dr. Eubanks caused the wrongful death and set his fault at 100 percent or the Clinic at 100 percent. Instead, the jury assessed fault at 75/25 percent, respectively.

With these principles of the law of proximate cause in view, we fail to see the significance of Dr. Eubanks' argument. Every negligent act of the doctor and the Clinic employees lead to a conclusion of cause in fact as well as legal cause. But for their negligence, it was forseeable that Joel would have become infected. Then, due to the infection, Joel contracted arachnoiditis and because of the arachnoiditis, Joel committed suicide.

The fundamental rules of fault compel our rejection of Dr. Eubanks' argument on this point. In *Allman v. Holleman*, 233 Kan. 781, Syl. ¶ 4, 667 P.2d 296 (1983), a wrongful death medical malpractice action, the Kansas Supreme Court held explicitly: "A party is at fault when he is negligent and his negligence caused or contributed to the

15

event which brought about the injury or damages for which the claim is made." This holding mirrors the language at issue in PIK Civ. 4th 105.01.

Because Dr. Eubanks, in challenging Instruction No. 11, does not argue the instruction was factually erroneous, *i.e.*, whether the evidence supported comparing the fault of himself and the Clinic, step three of the *Foster* analysis is not before us. See *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011) (issue not briefed by the appellant is deemed waived and abandoned). And, given our holding that the district court did not err in giving Instruction No. 11, we need not reach the harmless error analysis in step four. See *Siruta*, 301 Kan. at 773.

The trial court did not err when it used PIK Civ. 4th 105.01 to instruct the jury.

*The clinical social worker's testimony was admissible.*

Dr. Eubanks claims the district court erred in allowing a clinical social worker to testify at trial about the connection between Joel's arachnoiditis and his decision to commit suicide. Specifically, Dr. Eubanks argues the testimony was prohibited under K.S.A. 65-6319. We view this as a matter of trial court discretion. *Manhattan Ice & Cold Storage v. City of Manhattan*, 294 Kan. 60, 70, 274 P.3d 609 (2012).

The statute Dr. Eubanks cites, K.S.A. 65-6319, did not bar the social worker's testimony. During the pretrial conference, the district court addressed the admissibility of the deposition testimony of Sharleen Clauser, a licensed clinical social worker. In her deposition, Clauser testified that Joel's arachnoiditis and the associated symptoms contributed to his suicide. Dr. Eubanks and the Clinic argued that Clauser did not have authority under K.S.A. 65-6319 as a social worker to offer causation opinions at trial or to testify that Joel's arachnoiditis contributed to causing his suicide. The district court found that Clauser's testimony was admissible because the act of committing suicide was

16

not a medical condition and K.S.A. 65-6319 "talks about diagnosing and treating, not rendering opinion."

K.S.A. 65-6319 actually calls upon the worker to continue *treatment* of patients:

> "The following licensed social workers may diagnose and treat mental disorders specified in the edition of the diagnostic and statistical manual of mental disorders of the American psychiatric association designated by the board by rules and regulations:    (a) A licensed specialist clinical social worker . . . . *When a client has symptoms of a mental disorder, a licensed master social worker shall consult with the client's primary care physician or psychiatrist to determine if there may be a medical condition or medication that may be causing or contributing to the client's symptoms of a medical disorder*. . . . A licensed master social worker may continue to evaluate and treat the client until such time that the medical consultation is obtained or waived." (Emphasis added.)

We hold that K.S.A. 65-6319 does not affect the admissibility of Clauser's testimony in this case. In *Welch v. State*, 270 Kan. 229, 233-36, 13 P.3d 882 (2000), the Kansas Supreme Court clarified that the import of K.S.A. 65-6319 was to give licensed specialist clinical social workers the ability to diagnose and treat mental disorders and describe any such diagnosis to the jury. Here, Clauser's testimony did not concern the diagnosis or treatment of a mental disorder found in the manual specified by the statute.

Dr. Eubanks argues that the italicized language in K.S.A. 65-6319 above prohibited Clauser from testifying as to whether symptoms of Joel's "long-standing psychiatric diagnoses" may be associated with a medical condition or Joel's suicide. Dr. Eubanks points to no authority to support his claim that suicide is a medical condition. And the statute certainly does not bar her testimony.

The jury was free to weigh Clauser's opinion and any other evidence offered at trial regarding Joel's quality of life in deciding whether Joel's arachnoiditis caused by Dr.

17

Eubanks' and the Clinic's negligence subsequently caused or contributed to Joel's suicide. If, as Dr. Eubanks suggests, Joel's history of medical and psychiatric illness that predated the alleged medical malpractice here might have played a role in his suicide, Dr. Eubanks and the Clinic were not prevented by the admission of Clauser's testimony from asking the jury to take into account Joel's mental health history when determining fault. See *Maunz v. Perales*, 276 Kan. 313, 76 P.3d 1027 (2003).

The district court did not abuse its discretion in finding Clauser's testimony admissible. We turn to the issue of the necessity of expert testimony.

*Because there was expert testimony admitted in this case, we need not address the issue raised by Dr. Eubanks.*

Dr. Eubanks asserts that the Burnettes were required to show with expert testimony that Joel's suicide was caused by the claimed medical negligence here. He questions the reliability of *Wozniak v. Lipoff*, 242 Kan. 583, 750 P.2d 971 (1988), a prior case that rules to the contrary. Dr. Eubanks contends the ruling in *Wozniak* is simply wrong.

We need not rule on this claim. Dr. Eubanks acknowledges that Dr. Steven Simon testified at trial that the pain Joel suffered as the result of his arachnoiditis contributed to cause his suicide. Also, Clauser testified that the pain and disabilities that resulted from Joel's arachnoiditis contributed to cause Joel's suicide. Thus, there was expert testimony here.

Additionally, the jury could consider Joel's own anguished words that most eloquently spoke of his continuing pain that led him to take his own life.

18

*We will not alter the damage award in this case.*

Dr. Eubanks raises two arguments when challenging the Burnettes' wrongful death claim. He contends the phrase "loss of a complete family" in Instruction No. 19  was not legally appropriate, and he claims there was insufficient evidence to support the district court's decision to instruct the jury on the Burnettes' claim for economic damages under *Wentling v. Medical Anesthesia Services*, *P.A.*, 237 Kan. 503, 701 P.2d 939 (1985).

A party preserves an instruction error claim on appeal by timely objecting at trial and by stating the grounds for the objection. See K.S.A. 2015 Supp. 60-251(c)(1), (c)(2)(A), and (d)(1)(A). We question whether Dr. Eubanks has preserved these issues for review.

Instruction No. 19 told the jury it could consider the following categories of economic damages:  "Loss of attention, care, and loss of a complete family." Instruction No. 19 clarified that for these economic damages the jury "should allow an amount that you believe would be equivalent to the benefit plaintiffs Vernon and Gail Burnette could reasonably have expected to receive from the continued life of the deceased."

At the instruction conference, Dr. Eubanks and the Clinic objected to the district court giving Instruction No. 19 on the basis that there was insufficient evidence to support *Wentling* damages. Specifically, defense counsel stated, "Our objection is that it submits *Wentling* damages. And we think under the *Wentling* and subsequent cases that evidence needs to be presented, that was not presented in this case, to justify *Wentling* damages, which would be a financial loss beyond a noneconomic loss to the parents." Based on this objection, Dr. Eubanks has only preserved one of his arguments for appellate review.

19

Dr. Eubanks has not preserved his argument challenging the inclusion of the phrase "loss of a complete family" in Instruction No. 19. The objection did not refer to the phrase "loss of a complete family," nor did Dr. Eubanks or the Clinic argue, as they do here, that the inclusion of this language was error.

When raising new grounds challenging an instruction, the issue is treated as a failure to object to the instruction and clear error analysis applies. *State v. Cameron*, 300 Kan. 384, 388, 329 P.3d 1158 (2014). Consequently, while we will review Dr. Eubanks' "loss of a complete family" argument to determine whether the instruction was legally appropriate, we will only reverse based on this argument if we find clear error. In other words, if we find error we must be firmly convinced the jury would have reached a different verdict (or award) without the error. See *Siruta*, 301 Kan. at 774. Finally, because Dr. Eubanks preserved the *Wentling* argument, we will reverse if there is an error under *Wentling* and a reasonable probability that the error affected the outcome of the trial (or award) in light of the entire record. *Siruta*, 301 Kan. at 773.

Dr. Eubanks argues that Instruction No. 19 was improper because "loss of a complete family" is not a compensable category of economic damages in wrongful death actions in Kansas. He contends it does not fairly and accurately state the applicable law. See *Foster*, 296 Kan. at 308.

The district court instructed the jury that it could award both economic and noneconomic damages. Instruction No. 19 provided:

> "Economic damages include:
> 1. Loss of attention, care, and loss of a complete family.
> 2. Reasonable funeral expenses.
> For item 1 above, you should allow an amount that you believe would be equivalent to the benefit plaintiffs Vernon and Gail Burnette could reasonably have expected to receive from the continued life of the deceased.

20

"Noneconomic damages include:

1. Mental anguish, suffering, or bereavement.
2. Loss of society, loss of comfort, or loss of companionship.

For noneconomic damages, there is no unit value and no mathematical formula the court can give you. You should allow an amount that you find to be fair and just under all the facts and circumstances."

Dr. Eubanks argues this issue is controlled by *Howell v. Calvert*, 268 Kan. 698, 1 P.3d 310 (2000). In *Howell*, the plaintiff, in an action for wrongful death and damages for personal injuries arising out of a traffic accident, appealed in part from the district court's refusal to instruct the jury on the plaintiff's theory of economic damages. The jury instruction on noneconomic damages followed PIK Civ. 3d 171.32, "Wrongful Death of A Child," defining nonpecuniary loss. The plaintiff sought an instruction on economic loss that included damages for "loss of the value of a continued family relationship through the existence of a living child" and "loss of enjoyment and entertainment."

The Kansas Supreme Court in *Howell* held that the economic damages sought for loss of "continued family relationship" and "loss of enjoyment and entertainment" were, in fact, noneconomic damages. Relying on how PIK Civ. 3d 171.32 categorized and defined economic and noneconomic losses, the court stated:

"Without explicitly saying so, [plaintiff] advocates a change in the law. 'Continued family relationship' and 'loss of enjoyment and entertainment' are strikingly similar to loss of society, comfort or companionship-nonpecuniary damages. By requesting that the pecuniary damage instruction include these items, [plaintiff's] requested instruction goes beyond the traditional definition of pecuniary loss." 268 Kan. at 707.

In finding that the district court did not err, the *Howell* court found that the district court's instruction following PIK Civ. 3d 171.32 for the plaintiff's claim of economic damages for "[l]oss of services, attention, care, protection, and advice and counsel" was

21

consistent with the PIK instruction and caselaw. 268 Kan. at 707-08. Specifically, the court cited *Wentling*, 237 Kan. 503, and *Cerretti v. Flint Hills Rural Electric Co-op. Ass'n*, 251 Kan. 347, 365, 837 P.2d 330 (1992). *Howell*, 268 Kan. at 708.

In response to this argument, the Burnettes point to both *Cerretti* and the Kansas federal court ruling found in *Griffith v. Mt. Carmel Medical Center*, 842 F. Supp. 1359 (D. Kan. 1994), as authority for the inclusion of loss of complete family economic damages. We will examine both cases.

In *Cerretti*, the Kansas Supreme Court upheld a jury's award of pecuniary damages to the children of a deceased mother after letting stand jury instructions indicating that economic loss included

> "loss of services, attention, parental care, advice and protection, loss of their mother's nurturing, loss of the educational assistance of their mother, loss of the counsel and advice of their mother, loss of the moral training and guidance of their mother, *loss of the value of a complete family*, and loss of financial support which [the mother] would have provided during the children's minority." (Emphasis added.) 251 Kan. at 365.

In *Griffith*, the federal court found that under Kansas law damages for "loss of nurturing, loss of moral training and guidance, loss of educational assistance, and loss of the value of a complete family" were economic in nature. 842 F. Supp. at 1368-69. Citing to the holding in *Cerretti*, 251 Kan. at 366, allowing a jury instruction on economic damages for "loss of the value of a complete family," the federal court thought the Kansas Supreme Court intended to do what it did:

> "[o]ne must ask why the court found it necessary to even mention the trial court's instruction on what constitutes pecuniary damages. Surely, if the court, having reviewed the trial court's pecuniary damages instruction, believed that it erroneously included elements of nonpecuniary damages, the court would have said so. This court must assume

22

that the Kansas Supreme Court was mindful that by repeating the trial court's instruction and deciding not to disturb the jury's pecuniary damages award, it was casting favor upon the use of that instruction in future cases in Kansas district courts as well as diversity actions in this court." 842 F. Supp. at 1368.

We are not persuaded that the Burnettes' position on this is correct. First, *Cerretti* and *Griffith* predate *Howell*, which clearly was not casting favor on economic damages for loss of a complete family when the jury is similarly instructed on noneconomic damages. Second, there is no indication in *Cerretti* whether the instruction on noneconomic damages in that case raised the same concern as the one in *Howell* where the jury was also instructed it could award loss of society, comfort, or companionship noneconomic damages. Third, *Griffith* is distinguishable because the plaintiff had dismissed any claim for nonpecuniary damages. Thus, in rejecting the argument that it was improper to include "loss of the value of a complete family" in a wrongful death damages instruction and finding such damages consistent with *Wentling*, the concern in *Howell* was not before the federal court. 842 F. Supp. at 1369.

Here, the same concern as that in *Howell* about the repetitive nature of the economic and noneconomic instructions is present. Instruction No. 19 included a claim for "[l]oss of attention, care, and loss of a complete family" economic damages and "[l]oss of society, loss of comfort, or loss of companionship" noneconomic damages. More importantly, Instruction No. 19, with the inclusion of the phrase, "loss of a complete family," departs from how PIK Civ. 4th 171.32 categorizes and defines economic and noneconomic damages. Economic loss includes:  "1. Loss of filial care, attention, or protection." Nonpecuniary loss includes:  "1. Mental anguish, suffering, or bereavement," and "2. Loss of society, loss of comfort, or loss of companionship." PIK Civ. 4th 171.32.

23

It is reasonable to interpret *Howell* to mean that if a jury is instructed on loss of society, comfort, or companionship as elements of nonpecuniary damages in addition to loss of complete family as a category of economic damages, then the ability or inability to recover for the loss of a complete family is more properly directed to the weight of the evidence to support the instruction, not the ability of the plaintiff to recover.

Here, the Burnettes acknowledge on appeal that the evidence they presented at trial was only consistent with the evidence *Wentling* found sufficient to support a claim for loss of *attention and care*. The district court might have believed its inclusion of the "loss of a complete family" economic damages category in the instructions and verdict form was an attempt to tailor the instructions and verdict form to reflect the evidence. However, the evidence in the record, even if viewed in the light most favorable to the Burnettes, does nothing to distinguish loss of a complete family economic damages from loss of society, comfort, or companionship nonpecuniary damages. See *Foster v. Klaumann*, 296 Kan. 295, 301-02, 294 P.3d 223 (2013). Just as in *Howell*, 268 Kan. at 707, the jury instruction goes too far.

Accordingly, the district court erred in including the language "loss of a complete family" in Instruction No. 19.

*We find no clear error in the damages instruction.*

Given our determination that the inclusion of the "loss of a complete family" component of economic damages in Instruction No. 19 was not legally and factually appropriate, coupled with Dr. Eubanks' failure to preserve this argument, we must find clear error under step four of our analysis in order to reverse on this point. See *Siruta*, 301 Kan. at 774. Accordingly, we turn to the question whether we are firmly convinced the jury would have reached a different verdict (award) without the error. See *State v. Clay*, 300 Kan. 401, 408, 329 P.3d 484 (2014). The clear error determination must review

24

the impact of the erroneous instruction in light of the entire record, including the other instructions, counsel's arguments, and whether the evidence is overwhelming. *In re Care & Treatment of Thomas*, 301 Kan. 841, 849, 348 P.3d 576 (2013). Of note, Dr. Eubanks does not brief step four of our analytical framework—whether it was clear error to issue Instruction No. 19. See *Superior Boiler Works,* 292 Kan. at 889.

As mentioned, the jury awarded $550,000 for "loss of attention, care, and loss of a complete family." Given that the issue was not itemized separately, we have no means to differentiate between how the jury viewed the three claims or apportioned its award. However, reversal is not warranted, having already determined there was ample evidence substantiated in the record to establish under *Wentling* that there was a close family relationship and the pain suffered by Joel's parents is obvious. Ordinarily, reversal would be warranted under the clear error standard if "there was no evidence at all to establish the element of loss upon which the award in issue was based." *Wentling*, 237 Kan. at 511.

We are aware that we may find clear error if the award was so excessive or contrary to the evidence that it shocks our conscience. See *Wentling*, 237 Kan. at 511. This award does not shock our conscience. The award here was not so large to indicate that it was the product of passion or prejudice. It is comparable to other cases. See *Cerretti*, 251 Kan. at 365 (upholding award of $200,000 to a surviving husband and $850,000 to three surviving children based on testimony of husband and economist, observing "there can be no serious contention that the care, guidance, and services of a spouse and parent lack monetary value"); *Leiker v. Gafford*, 245 Kan. 325, 348, 778 P.2d 823 (1989), *overruled on other grounds by Martindale v. Tenny*, 250 Kan. 621, 829 P.2d 561 (1992) (upholding award of $1,000,000 for economic damages in part for loss of parental care and attention and loss of maternal training and guidance); *Wentling*, 237 Kan. at 514 (approving award of $761,166.64 for economic losses); *Huffman v. Thomas,* 26 Kan. App. 2d 685, 693, 994 P.2d 1072, *rev. denied* 268 Kan. 886 (1999) (upholding award of $907,732.52 in economic damages).

Accordingly, while the district court should not have instructed the jury on loss of a complete family economic damages, we are not convinced the jury would have reached a different award. Therefore, we hold this was not clear error.

*We move on to examine the factual basis for the instruction on damages.*

Under the next step of our inquiry, we must determine whether sufficient evidence supported the Burnettes' theory of economic damages. See *Foster*, 296 Kan. at 301. In this context, there must be evidence supporting the Burnettes' theory of economic damages which, if accepted as true and viewed in the light most favorable to the Burnettes, is sufficient for reasonable minds to reach different conclusions based on the evidence. See *Foster*, 296 Kan. at 302 (citing *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 419, 228 P.3d 1048 [2010]). Taking into account the erroneous inclusion of "loss of a complete family" in Instruction No. 19, if reasonable people could disagree over whether the Burnettes suffered damages for "[l]oss of attention, care," then the district court should have instructed the jury to determine such damages.

In Kansas, parents have long been able to recover economic damages for the death of a majority-age child. See *Railway Co. v. Fajardo*, 74 Kan. 314, 324, 86 P. 301 (1906). The Kansas Supreme Court has defined economic or pecuniary damages as follows: "Pecuniary damages are '[s]uch as can be estimated in and compensated by money . . . .' [Citation omitted.]. . . Pecuniary loss or damages in a wrongful death case should be equivalent to those pecuniary benefits or compensation that reasonably could have been expected to have resulted from the continued life of the deceased." *McCart v. Muir*, 230 Kan. 618, 626, 641 P.2d 384 (1982); see *Wentling*, 237 Kan. at 507.

In *Wentling*, the Kansas Supreme Court considered in detail what kind of proof is necessary to support an award of damages for economic loss. The *Wentling* case included an instruction identifying "[l]oss of services, attention, parental care, advice, and

26

protection" as pecuniary damages. 237 Kan. at 505. Our Supreme Court clarified that a plaintiff in a wrongful death case is not required to establish his or her economic loss with mathematical certainty. Rather, a plaintiff may satisfy the burden of proof by establishing the nature and extent of the losses asserted. 237 Kan. at 510. Once such evidence is presented, the jurors are presumed to be capable of converting the losses into monetary equivalents based on their own knowledge and experience. 237 Kan. at 510; see *Cerretti*, 251 Kan. at 363 (stating that a jury is not bound by expert economic testimony in estimating future loss); *Huffman v. Thomas*, 26 Kan. App. 2d at 692 (applying standard for *Wentling* damages).

Dr. Eubanks argues that even though Joel "had a close relationship with his parents," the Burnettes presented no evidence of *Wentling* damages because the record is devoid of "any evidence [Joel] provided services, counsel, guidance, financial support or anything else of an *economic nature*." (Emphasis added.) Dr. Eubanks appears to be asking this court to limit pecuniary damages to only those certain services that can be equated to a specific monetary value. Dr. Eubanks, however, interprets pecuniary damages too narrowly.

In *Wentling*, the Kansas Supreme Court explained that a pecuniary loss may arise from a "'deprivation of benefits that could reasonably be expected to have been received, originating from no more than a moral obligation.'" 237 Kan. at 509. *Wentling* further clarified: "'The fact that such matters as loss of care, training, advice, guidance and education are not readily reduced to a present money value does not mean that those factors need not be taken into consideration.'" 237 Kan. at 509. In stressing that the inability of the plaintiff to translate the loss of certain services or care by his wife into a specific monetary figure was not fatal to recovery, the court considered testimony regarding the closeness of their marriage and the extent of attention and marital care he received from his wife that had been lost sufficient to support the award of damages. *Wentling*, 237 Kan. at 513-14.

27

In *Huffman*, the parents brought a medical malpractice action alleging a surgeon's negligence caused their son's death. This court considered whether the evidence was sufficient to award $907,732.52 in pecuniary damages for separate claims of "loss of services, loss of attention, loss of filial care, [and] loss of protection." 26 Kan. App. 2d at 693. In holding that the evidence was sufficient to support the amount of the award, this court pointed to testimony regarding specific services or "contributions around the house" by the son that had been lost. However, with respect to the claims for loss of attention and care, this court noted the evidence of "the companionship" the son provided. Specifically, this court pointed to evidence supporting "the loving relationship" between the parents and their child, that "[t]he family spent a lot of time together," and that the son was a "caring person." 26 Kan. App. 2d at 693.

Here, the record reveals that multiple witnesses testified that "Joel devoted great care to his parents, that Joel engaged in numerous and regular activities with his parents, that Joel was very attentive to the needs of his parents, and that Joel was very close to his parents." Even Dr. Eubanks concedes on appeal that "[w]ithout question, Joel Burnette had a close relationship with his parents" and "[n]o one doubts the closeness of the family."

The Burnettes' evidence, which if accepted as true and viewed in the light most favorable to them, supports their claim for pecuniary damages under *Wentling*. And, while neither party attempted to place a specific dollar value on the economic damages through expert testimony, "the triers of fact are presumed to be capable of converting the losses into monetary equivalents on the basis of their own experience." *Wentling*, 237 Kan. at 514. In other words, because the jury has wide discretion in determining the amount of an award of damages, we should be predisposed toward upholding the jury's application of the district court's instructions. See *Wentling*, 237 Kan. at 511. Sufficient evidence, therefore, supported the district court giving Instruction No. 19 on *Wentling* damages.

28

*We turn to the two concluding issues.*

There are two final arguments brought by the Clinic and Dr. Eubanks—one deals with a comment by a prospective juror and the other is a claim of error when the court allowed the jury to take an exhibit back to the jury room.

During voir dire, a prospective juror made an unsolicited comment that Dr. Eubanks and the Clinic had insurance coverage. Counsel moved to strike the entire venire panel. The district court denied the motion but removed the prospective juror. The court instructed the jury that it was not to consider the existence or lack of insurance during its deliberations. The judge told the jury the existence or lack of insurance should not be interjected at trial. Dr. Eubanks contends the district court erred when it failed to strike the venire panel. He contends the prospective juror's inadvertent comment prejudiced the jury's award to such an extent that it warrants reversal of the judgment. We are not so convinced.

We view this as a matter of discretion. See *Foster v. Stonebridge Life Ins. Co.*, 50 Kan. App. 2d 1, 25, 327 P.3d 1014 (2012).

Here is what was said:

"*Honestly I feel like the insurance company with the doctors can be paying the money. So if the doctor did anything wrong, he's really not ever going to feel the pain for it*. So ultimately it's accomplishing a zero reward because there is no benefit for some sort of a loss of a loved one, yes, but actually I'm not sure what it is actually accomplishing. *But that is how insurance works*." (Emphasis added.)

In ruling upon this motion, the trial judge patiently entertained all arguments on the request. The court heard further arguments during the afternoon break. The court informed the parties that it intended to instruct the jury that insurance would not be a part

29

of the case or considered. At the completion of the Burnettes' voir dire examination, the court admonished the jury panel that it could not consider insurance:

"The existence of any insurance coverage or the lack of any insurance coverage shall not enter into your consideration or deliberation of this case. Kansas law is very clear on this point, and your failure to follow the law will be a violation of your sworn duties as jurors."

The next day the judge denied Dr. Eubanks' motion to strike the venire panel, explaining that the juror's comment was unsolicited; was made by a prospective juror during jury selection, not by a witness in trial; and was a general statement not directed to any particular party. The court pointed to the limiting instruction as making it clear that any aspect of insurance is not an issue.

The collateral source rule is alive and well in Kansas. See K.S.A. 60-454; *Kansas Med. Mut. Ins. Co. v. Svaty*, 291 Kan. 597, 629, 244 P.3d 642 (2010). In fact, our Supreme Court has made it clear that the deliberate injection of insurance into trial testimony constitutes prejudicial and reversible error. See *Unruh v. Purina Mills, LLC*, 289 Kan. 1185, 1198, 221 P.3d 1130 (2009). But we are not dealing with a deliberate insertion of insurance into the issues of this case.

Historically, the Kansas Supreme Court has considered the inadvertent mention of insurance not to be a prejudicial error. In *Langley v. Byron Stout Pontiac*, *Inc.*, 208 Kan. 199, 202, 491 P.2d 891 (1971), the court considered whether a prospective juror's question during voir dire—"'What about the insurance that we've been paying for? Isn't that supposed to take care of these little things?'"—was prejudicial error. Noting that there was no evidence of insurance introduced during the trial, the court held: "[w]hen the mention of insurance during a trial is purely inadvertent and is not brought into the case by intentional misconduct of plaintiff's counsel prejudicial error has not been

30

committed thereby." 208 Kan. at 203. This ruling has been reaffirmed in *Unruh*, 289 Kan. at 1199. *Unruh* acknowledged that when the subject of insurance is inadvertently injected into a trial, a district court may remedy the error by issuing a curative instruction.

Dr. Eubanks does not dispute the district court's finding that the prospective juror's reference to insurance during voir dire was inadvertent and not solicited by counsel, nor does he point to any other evidence in the trial that is contrary to the collateral source rule.

Nevertheless, Dr. Eubanks asks us to depart from the ruling in *Langley* and *Unruh* and find that prejudice can arise from an inadvertent reference to insurance during voir dire when the verdict is challenged as excessive even if a curative instruction is given. He cites *Borth v. Borth*, 221 Kan. 494, 561 P.2d 408 (1977); *Bott v. Wendler*, 203 Kan. 212, 453 P.2d 100 (1969); and *Pool v. Day*, 141 Kan. 195, 40 P.2d 396 (1935). We are not convinced. None of these cases actually support Dr. Eubanks' position.

In *Pool*, the plaintiff twice voluntarily injected testimony into the case referring to insurance. In ruling, the Kansas Supreme Court emphasized that the district court had a duty to see the prejudicial matter did not reach the jury and stated:

> "[w]hether or not objections and motions to strike out have been promptly made, it has been held to be the duty of the trial court to carefully exclude all highly prejudicial matter from the jury, and *admonish* the jury to wholly disregard the same in the hope thereby of avoiding a mistrial or the necessity of a new trial on account of the possible prejudice and passion created thereby in the minds of the jurors." (Emphasis added.) 141 Kan. at 200.

Indeed, the Supreme Court reversed the judgment of the district court after holding that the plaintiff's reference to insurance was prejudicial and was likely to create passion and prejudice and increase the amount of the verdict, which the court found was

31

excessive. Dr. Eubanks seizes upon this, arguing that the critical factor was the excessive verdict in *Pool*.

Essentially, Dr. Eubanks maintains that the presence or absence of an excessive award is dispositive in determining whether an inadvertent interjection of insurance into a trial prejudiced and inflamed the jury against the defendant, even if the district court gave a curative instruction. Dr. Eubanks is misreading the facts in *Pool*. The Supreme Court, in discussing the two instances when the plaintiff in *Pool* voluntarily injected testimony of insurance, noted that the first reference to insurance was not objected to, nor was there a request to admonish the jury. The court then noted in the second instance, such a motion was made and plaintiff's counsel promptly agreed, but nothing further was done in the way of withdrawing it from the jury or admonishing the jury to disregard it. Clearly, the impact of the curative instruction on the jury was not a question in *Pool*. This is evident when the court emphasized the district court's duty to see that prejudicial matters do not reach the jury by admonishing it. 141 Kan. at 203.

Basically, *Pool* stands for the proposition that irrespective of whether a party raises an objection, if the district court does not promptly advise the jury not to consider the matter of insurance inadvertently interjected into a trial and further instruct the jury to that effect, it is error if the verdict is excessive. Given the district court's curative instruction to the jury in this case, the factual scenario in *Pool* simply is not the same. Besides, the ruling in *Pool* predates the clear holding in *Langley*, 208 Kan. at 203, that no prejudicial error occurs when the mention of insurance is purely inadvertent and not intentional.

Turning to the other two cases that Dr. Eubanks relies upon, in *Bott*, the Kansas Supreme Court addressed whether the probability and fact that the defendants were covered by liability insurance was injected into the case materially prejudiced the defendants. During trial, witnesses had mentioned the name of a person who was an

insurance agent. The defendants moved for a mistrial, which was denied. Our Supreme Court found that any reference to the defendants being covered by automobile liability insurance was indirect, inadvertent, and within the general knowledge of the jury, so no prejudicial error arose. 203 Kan. at 228. Dr. Eubanks hangs his hat on the following statement about the lack of effect on the award:

"As indicated, the district court and counsel did not consider the award excessive, and defendants have never contended the verdict was not supported by the medical evidence. Against this background, the argument that the jury's award was accelerated by the alleged insurance factor is not persuasive." 203 Kan. at 228.

*Bott* is not helpful. Like *Pool*, no curative instruction was given in *Bott*. It seems to us that the holding in *Bott* is more in line with *Langley*, which specifically cites *Bott* to support its holding regarding the nonprejudicial impact of the inadvertent mention of insurance even without a curative instruction. See *Langley*, 208 Kan. at 203.

Finally, in *Borth*, the Kansas Supreme Court found the plaintiff's unresponsive answer during cross-examination indicating the defendant had insurance was inadvertent and a curative instruction admonishing the jury cured any possible prejudice. 221 Kan. at 497. The court then stated: "The size of the verdict, $9,500, is modest compared to the actual damages of over $20,000 claimed, and the total recovery of $250,000 sought." 221 Kan. at 497. Dr. Eubanks argues that this statement in *Borth* indicates that our Supreme Court finds "the presence or absence of an excessive damage award . . . important in determining whether the jury was prejudiced and inflamed against the defendant by the inappropriate insurance reference."

We view this follow-up statement by the Supreme Court to be dicta. Our appellate courts since *Borth* have repeatedly acknowledged the principle that the inadvertent mention of insurance may be cured by an instruction to the jury to disregard it. See

33

*Unruh*, 289 Kan. at 1199; *Tetuan v. A.H. Robins Co.*, 241 Kan. 441, 479, 738 P.2d 1210 (1987); *Kelty v. Best Cabs, Inc.,* 206 Kan. 654, 656, 481 P.2d 980 (1971); *Tamplin v. Star Lumber & Supply Co*., 16 Kan. App. 2d 352, 359-60, 824 P.2d 219 (1991), *aff'd as modified* 251 Kan. 300, 836 P.2d 1102 (1992).

In conclusion, we find no prejudicial error in this case from the inadvertent mention of insurance during voir dire. The district court cured any possible prejudice when it properly admonished the jury not to consider the existence or absence of insurance coverage during its deliberation. We find no abuse of discretion in not striking the venire panel.

For his ultimate issue, Dr. Eubanks claims that the district court erroneously admitted Exhibit 114, a drawing that Helfer marked during his deposition, without foundation or applied the wrong legal standard in determining the admissibility of the drawing. Dr. Eubanks does not dispute that both he and the Clinic at trial only objected to the jury viewing Exhibit 114 during its deliberations. Given this concession, the sole question before us is whether it was error to give the jury Exhibit 114 to take back into the jury room. The manner in which exhibits are handled at trial is within the trial court's discretion and will not be disturbed except in cases of abuse. See *State v. Fenton*, 228 Kan. 658, 667, 620 P.2d 813 (1980).

In *Fenton*, the Supreme Court stated that once a case is submitted to the jury for deliberations, the jury is ordinarily given the exhibits to take into the jury room where the jurors can examine the exhibits as many times as they desire. 228 Kan. at 667. Here, Helfer, during the course of his testimony at trial, explained the limitations of Exhibit 114 and made it clear that his marks on the exhibit were only approximations based upon his notes from January 12, 2009. The jury had the opportunity to view Exhibit 114 and formulate opinions during the course of Helfer's testimony and then consider Helfer's testimony after hearing from Dr. Carl Bakken. Dr. Eubanks has not demonstrated how

34

Exhibit 114 being allowed into the jury room results in any prejudice. We find no abuse of discretion on this point.

Affirmed.